(No. 54329.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. LUIS GARCIA, Appellant.

*Opinion filed June 17, 1983.—Rehearing*
*denied September 30, 1983.*

John T. Theis, David R. Donnersberger, and Eva Field, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, and Michael E. Shabat and Dean P. Karlos, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Luis Garcia, was convicted of four counts of murder, four counts of attempted murder, 10 counts of armed violence, eight counts of armed robbery and five counts of aggravated battery. Defendant was also convicted on a single count each of rape, aggravated kidnaping, deviate sexual assault, taking indecent liberties with a child, and conspiracy. The State sought the death penalty and, after a sentencing hearing, the same jury determined that defendant was eligible for the death sentence and that there were no mitigating factors sufficient to preclude imposing that penalty. Although the trial court then sentenced defendant to death on his murder conviction, it did not impose any sentences on defendant's other convictions. The death sentence was stayed by the trial court as required by our Rule 609(a) (73 Ill. 2d R. 609(a)), and defendant appealed directly to this court pursuant to section 4(b) of article VI of our constitution of 1970 as implemented by section 9—1(i) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(i)) and our Rule 603 (87 Ill. 2d R. 603).

The 36 crimes for which defendant was convicted in this cause were committed during a period of only several

hours. The testimony introduced at trial indicated that on January 7, 1980, defendant and an accomplice, Roger Llaguna, entered a small grocery store on Wabansia Avenue in Chicago at approximately 6:30 p.m. William and Aida Pagan, the owners of the store, were in the sales area of the establishment, as was an employee, Miguel Hernandez. Also present was a neighborhood resident, Juan Jiminez. Mr. Hernandez testified that Llaguna, who was armed with two handguns, proceeded alone to the rear of the sales area, where he immediately shot both William Pagan and Juan Jiminez twice. Autopsies revealed that William Pagan had actually received three bullet wounds and that Juan Jiminez had suffered two bullet wounds. Llaguna then returned to the front of the store and shot Miguel Hernandez in the head, neck and back. As he was falling to the floor, and just before losing consciousness, Mr. Hernandez saw defendant, who was armed with one handgun, shoot Aida Pagan.

Another witness, Melvin Crawford, testified that he was about to enter the Pagans' grocery store at approximately 6:45 that evening when he encountered a man with two guns leaving the store. That individual, whom Mr. Crawford later identified as Roger Llaguna, asked as to what Mr. Crawford was looking at; Mr. Crawford responded that he had not seen anything and, after backing away a short distance, ran down the street.

Upon their arrival, Chicago policemen found Miguel Hernandez, who was bleeding profusely, sitting on a carton at the front of the store. Aida Pagan was found lying across William Pagan, her husband, and next to Juan Jiminez, both of whom appeared to be already dead. Although she was lapsing in and out of consciousness, Mrs. Pagan was able to indicate that they had been attacked by two Latinos. Aida Pagan was declared dead on arrival when transported to a hospital, as were William Pagan and Juan Jiminez. The police also found that the store's

cash register, which Mr. Hernandez testified had contained "folding money," was devoid of currency. A description of a car which had pulled away from the store just after the shootings was obtained by investigators from two neighbors who had heard gunshots. This description was later included in a city-wide police radio broadcast.

After leaving the store, which was located at 3022 West Wabansia, defendant and Llaguna apparently went to the Lincoln Tavern, located at 1858 West Wabansia. They entered the tavern at approximately 7:15 p.m. and, after seating themselves near the middle of the bar, ordered beer from the barmaid, Dorothy Oszkandy. The only other occupants of the bar were Christine Mroz, Walter Lesniak and Dorothy Oszkandy's 10-year-old daughter, Denise. Christine Mroz, who had moved to the United States from Poland only four years earlier, was related to the owners of the tavern and lived with her relatives in living quarters which were connected to the tavern. She often sought to improve her command of the English language by talking with patrons of the tavern. That evening she was conversing with Walter Lesniak, a regular customer in the tavern. They were seated near the cash register, which was located at the front of the tavern. Miss Mroz concluded her conversation with Mr. Lesniak soon after defendant and Llaguna arrived and returned to her living quarters, passing through the rear of the tavern where Denise Oszkandy was watching television. Shortly thereafter, Clara Satha, an elderly woman who was also a regular customer, entered the tavern and joined Mr. Lesniak at the bar. Defendant then approached the front of the tavern and, after glancing out the window, turned and said, "This is a stick-up." Brandishing a handgun, defendant warned Dorothy Oszkandy not to reach for a gun and ordered her to give him the money in the cash register. Defendant also ordered Walter Lesniak and Clara Satha to place all of their money on the bar. When Mrs. Oszkandy turned

slightly to check on her daughter, defendant shot her in the side and then shot Walter Lesniak in the side. In response to defendant's repeated demand, Mrs. Oszkandy staggered to the cash register and managed to place the money onto the bar before losing consciousness.

Meanwhile, Roger Llaguna had ordered Denise Oszkandy to join her mother behind the bar and she had begun to do so when defendant shot Mrs. Oszkandy. Llaguna then pulled Denise back and forced her to accompany him through the passageway leading to the adjoining living quarters. Denise Oszkandy testified that they encountered Christine Mroz in the dining room. After Miss Mroz rose from her chair, Llaguna fired three shots at her, causing her to fall to the floor. An autopsy later revealed that Miss Mroz died of a gunshot wound to the head.

Defendant and Roger Llaguna then left the tavern, taking Denise Oszkandy with them in their car. After ordering her to keep her head down, they drove to an unoccupied basement where both men sexually assaulted her and engaged in a number of deviate sexual acts, including inserting the barrel of a handgun into her vagina. Denise Oszkandy was then forced back into the car.

Officer Richard Spiegel, a Chicago policeman, testified that he and his partner were patrolling in an unmarked squad car when they received a radio message which updated an earlier broadcast describing the car seen leaving the scene of the grocery store murders. The supplementary broadcast informed them of the abduction of Denise Oszkandy. They proceeded to join in the search and, upon arriving in the neighborhood of the crimes, spotted a car that matched the description and which police later discovered was driven by defendant. The plainclothes officers signaled a marked patrol car to follow them, and when those officers momentarily spotted a little girl's head pop up between the figures of the other two occupants of the suspicious car, they attempted to stop that car. A high-speed

chase ensued during which Roger Llaguna fired several shots at the police.

Defendant, after losing control and crashing the car into a parked vehicle, jumped out and attempted to run away. Officer Spiegel, who had been shot in the leg while leaving his own car, shot defendant in the hand, causing him to fall to the ground, where he was placed under arrest. At the time of his arrest, defendant was unarmed, but a fully loaded .38-caliber Rohm revolver was found on the driver's side of the front seat in the car which he had been driving. Roger Llaguna, who had fled into an alley, was killed while engaging in a gun battle with the police officers who pursued him. Police investigators recovered a Smith & Wesson .357-caliber magnum revolver next to Llaguna's body. Denise Oszkandy, who had not sustained any injuries in the crash itself, was found in the car driven by defendant and was taken to a local hospital for examination and treatment.

At trial, a ballistics expert testified that while some of the firearm evidence recovered at the grocery store and the tavern was unsuitable for analysis, the identifiable evidence conclusively demonstrated that Aida Pagan had been shot both by the .357 Smith & Wesson revolver recovered from Roger Llaguna and the .38 Rohm revolver recovered from the driver's seat in the crashed getaway car. In addition, the expert was able to state that William Pagan and Juan Jiminez had both received at least one wound each from the .38 Rohm revolver, which had also been used, in his opinion, to shoot Dorothy Oszkandy. The physical evidence also showed that Christine Mroz had been shot with the Smith & Wesson .357 revolver.

Defendant, attacking both his convictions and the imposition of the death penalty, raises a number of issues pertaining to his trial and sentencing hearing. We consider first the challenges to the fairness of defendant's trial, detailing additional factual matters not set forth above where

necessary. Prior to trial, the defendant unsuccessfully moved for an order suppressing any reference to pretrial identification of defendant both by Miguel Hernandez, the only surviving witness to the grocery store killings, and by Walter Lesniak, one of the victims at the tavern. Defendant also sought to suppress any in-court identification by those same witnesses claiming that the identification evidence constituted the product of procedures on the part of the police which were "unnecessarily conducive to irreparable mistaken identification." The testimony at the hearing on the motion to suppress identification testimony by Walter Lesniak indicated that while he was receiving treatment in a hospital emergency room, Mr. Lesniak was told by a police officer that Denise Oszkandy had been safely recovered and that two suspects had been apprehended. Mr. Lesniak had also seen a newspaper article concerning the shootings, accompanied by a large photograph of defendant, but because he was not wearing his glasses and only glanced at the item in a cursory fashion, had not learned any details of the incident. Either one or two days after the shootings, Mr. Lesniak was visited in the hospital by Officer Curtis, who showed Mr. Lesniak a lineup photograph depicting five individuals, including defendant. Both Officer Curtis and Mr. Lesniak testified that Officer Curtis left without having discussed the incident immediately after Mr. Lesniak identified one of the individuals in the lineup. When asked at the hearing if the person he had identified in the lineup photo was the same person who had appeared in the newspaper photograph, Mr. Lesniak stated, "He looked a little bit different. Uh, the picture I saw in the Tribune, uh, was very—. Well, he was disheveled and, well, dirty, et cetera, et cetera."

The trial court sustained objections to numerous questions by defendant's attorney concerning conversations between Walter Lesniak and police officers while Mr. Lesniak was in the hospital emergency room, the length of time

that Mr. Lesniak had been in the tavern prior to the shootings, the description of the assailants which Mr. Lesniak had given police at the time of the incident, and the type of medication which Mr. Lesniak was receiving at the time of the photographic identification. At the close of the hearing, defense counsel stated for the record that he considered the questions which he had sought to ask important because of the fact that Mr. Lesniak had seen the newspaper photograph of defendant, but he declined to offer any argument on behalf of the motion and rested on the testimony of Officer Curtis and Walter Lesniak.

The hearing held pursuant to the motion to suppress the identification testimony of Miguel Hernandez was complicated by the fact that Mr. Hernandez, who spoke no English, was forced to testify through an interpreter. It is apparent from the record that the translation process created confusion at times on the part of Mr. Hernandez and the examining attorneys both during the suppression hearing and, despite the substitution of a different interpreter, at trial. On its face, the testimony of Mr. Hernandez, who was the only witness at the suppression hearing, seems somewhat ambiguous and inconsistent. That testimony revealed that he was visited by a police officer in the hospital when he first regained consciousness five days after being shot and that the officer had shown Mr. Hernandez a photograph of five persons. Mr. Hernandez stated that he had pointed out one of the individuals when asked if he could identify the person that had shot him. After a number of intervening questions concerning the length of the officer's visit and the nature of their conversation, Mr. Hernandez stated that he had taken the photograph into his own hands when viewing it and that while he was holding it, the officer had pointed to defendant and asked if he was the person who had come into the grocery store. On cross-examination, Mr. Hernandez testified that he had pointed out his selection to the policeman and that the policeman

had not told him which man to pick out.

In his attack on the trial court's denial of the motions to suppress the identification testimony of Miguel Hernandez and Walter Lesniak, defendant argues that he was denied a fair hearing on the motions and, in any event, that the trial court erred in their denial. Defendant, referring us to *People v. Robinson* (1970), 46 Ill. 2d 229, asserts that the hearings were unfair because the trial judge precluded defense counsel from making an effective inquiry into the reliability of the witnesses' identification testimony by sustaining objections to questions designed to reveal whether there was any independent basis for the identifications. This argument, however, misapprehends the allocation of the burden of persuasion in a suppression hearing. Our decisions have made clear that the defendant must first establish that the pretrial identification procedure was unnecessarily suggestive and that the evidence will then be suppressed unless the State is able to show by clear and convincing evidence an independent basis of reliability. (*People v. McTush* (1980), 81 Ill. 2d 513, 520; *People v. Blumenshine* (1969), 42 Ill. 2d 508, 511. See *People v. Bryant* (1983), 94 Ill. 2d 514, 520.) The inquiry prescribed in *Blumenshine* and repeated in *Robinson,* mandating consideration of such factors as how well the witness was able to observe the criminal act, the accuracy of any description furnished by the witness, and whether the witness had been previously acquainted with the defendant, is relevant only to evaluate the independent basis of reliability. (See *People v. Bryant* (1983), 94 Ill. 2d 514; *People v. Hopkins* (1973), 53 Ill. 2d 452.) The questions which defense counsel was precluded from asking were simply not relevant to the issue of whether the identification procedure had been unnecessarily suggestive, and the trial judge did not deny defendant a fair hearing by sustaining objections to those inquiries.

In addition, we cannot agree that the trial judge erred

in denying defendant's motions to suppress. It is well established that a trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Holloway* (1981), 86 Ill. 2d 78; *People v. Conner* (1979), 78 Ill. 2d 525; *People v. Williams* (1974), 57 Ill. 2d 239, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506; *People v. Clay* (1973), 55 Ill. 2d 501.) The testimony presented at the hearing concerning Walter Lesniak's identification contains no indication of any suggestive conduct on the part of the police. Nor can we say from our review of the testimony of Miguel Hernandez that the trial court erred in resolving the contradictions in his testimony by determining that defendant had failed to sustain his burden of proving suggestive conduct. Although defense counsel established at both hearings that defendant was in custody at the time the photographic identifications were made, he did not argue then or now that the procedures employed were unnecessary. Nevertheless, we consider it appropriate to add that while we ordinarily disapprove of using photographic-identification procedures when a defendant is in custody and available for an in-person lineup identification, a lineup was not feasible here. (See, *e.g., People v. Kubat* (1983), 94 Ill. 2d 437, 471-72; *People v. Williams* (1975), 60 Ill. 2d 1, 9.) Walter Lesniak and Miguel Hernandez were both hospitalized with serious gunshot wounds, and under such circumstances, it was not improper for the police to conduct a photographic-identification procedure.

As another basis for arguing that his trial was unfair, defendant asserts that the trial court failed to conduct a proper hearing to determine whether Denise Oszkandy, who was 11 years old at the time of the trial, was competent to testify. After calling her to the witness stand, the prosecutor proceeded to ask her to spell her name and give her age. Defense counsel then requested a conference outside the hearing of the jury which the trial judge denied af-

ter asking her a few questions of his own, inquiring as to her age, the name and location of her school and her grade level in school. The judge also asked her whether she knew the difference between telling the truth and telling a lie and whether she knew the consequences of telling a lie in court. Denise responded that she knew the difference between telling the truth and telling a lie, and that, "If you tell a lie and if you're in court, you go to jail." It is the degree of a child's intelligence, rather than mere chronological age, that determines a child's competence, and "[i]f the witness was sufficiently mature to receive correct impressions by her senses, to recollect and narrate intelligently, and to appreciate the moral duty to tell the truth, she was competent." (*People v. Davis* (1957), 10 Ill. 2d 430, 436, *cert. denied* (1957), 355 U.S. 820, 2 L. Ed. 2d 35, 78 S. Ct. 25. See also *People v. Edwards* (1973), 55 Ill. 2d 25, 33, *cert. denied* (1974), 415 U.S. 928, 39 L. Ed. 2d 486, 94 S. Ct. 1438; *People v. Brown* (1972), 52 Ill. 2d 94, 104-05; *People v. Ballinger* (1967), 36 Ill. 2d 620, 622, *cert. denied* (1967), 388 U.S. 920, 18 L. Ed. 2d 1366, 87 S. Ct. 2141.) There is no rigid formula which is applicable to a determination of competency, and the record reflects that the trial court was satisfied by Denise's responses to his questions that she was competent to testify. Decisions as to the competency of a witness are reviewable, but in light of the trial court's opportunity to take into account the demeanor of the witness, this court has held that such determinations will be overturned only when it appears that the trial judge has abused his discretion. (*People v. Brown* (1972), 52 Ill. 2d 94, 105; *People v. Ballinger* (1967), 36 Ill. 2d 620, 622; *People v. Davis* (1957), 10 Ill. 2d 430, 437.) This court has approved findings of competency based upon much weaker evidence than we have here (see, *e.g., People v. Ballinger* (1967), 36 Ill. 2d 620), and in our judgment, the trial judge did not err in permitting Denise to testify.

Defendant next argues that he was not proved guilty

beyond a reasonable doubt of rape and that the trial court's failure to direct a verdict of not guilty on that charge prejudiced his right to a fair trial on the other charges. In support of the charge of rape, the State introduced the testimony of Denise Oszkandy, Officer Donna McDermott, and Dr. Luisito Evangelista. At trial, when questioned about the nature of the assault upon her by defendant and Roger Llaguna, Denise stated unequivocally that both men had inserted a finger into her vagina and that Roger Llaguna had also placed a gun barrel into her vagina. She also said that defendant had tried to insert his penis into her vagina, and when asked whether he had done so, repeated, "He tried to." The prosecutor did not question her further on the matter. Officer McDermott, who was assigned to take her to the hospital, described the disheveled and shaken condition in which she found Denise upon arriving at the scene of defendant's capture. In addition, Officer McDermott testified that she asked her if she was all right and that Denise had replied, "Yes, and I didn't want to do it, but they made me, I was scared." When asked what had happened to her, Denise Oszkandy had again replied, "I didn't want to do it, but they made me, I was scared." When asked for his conclusion, Dr. Evangelista, who examined her at the hospital, stated: "There is some either hard object or penis being pushed into the vagina with a kind of trauma." He added that Denise had asked, "Did I commit sin?" Although Dr. Evangelista stated that there was vaginal tenderness and swelling, as well as slight bleeding, the State did not present any evidence as to the presence of semen.

Although defendant was not sentenced on the rape conviction, a fact which would ordinarily preclude its consideration on appeal (see, e.g., *People v. Dixon* (1982), 91 Ill. 2d 346, 352), we may address the issue because defendant's challenge to finalized convictions arising out of the same trial are properly before us. (*People v. Scott* (1977), 69 Ill.

2d 85, 88; *People v. Lilly* (1974), 56 Ill. 2d 493, 496.) Under Illinois law, it is clear that one of the elements which must be proved to sustain a rape conviction is penetration of the female sex organ by the male sex organ. (Ill. Rev. Stat. 1979, ch. 38, par. 11—1. See *People v. Harper* (1972), 50 Ill. 2d 296, 300; *People v. Stagg* (1963), 29 Ill. 2d 415, 417.) In our judgment, the evidence simply fails to establish penetration to any degree. Denise's testimony indicates that she was able to articulate the fact of penetration with regard to other aspects of the sexual assault upon her, and we think it significant that she insisted that defendant only tried to achieve penetration, rather than stating that it had occurred. Officer McDermott's testimony fails to show any act of penetration, and the medical evidence is also inconclusive on that point in light of the fact that the traumatic injuries observed by Dr. Evangelista were completely consistent with the insertion of the gun barrel. Consequently, we find that the trial court erred in failing to direct a verdict of not guilty on the charge of rape.

Despite the faulty rape conviction, we cannot agree with defendant that the trial court's failure to direct a verdict on that charge inflamed the jury and vitiated defendant's right to a fair trial on the other charges. The evidence presented by the State in support of the rape charge concerned only one part of a course of conduct and one aspect of a broader sexual assault upon Denise; indeed, the evidence presented on the rape charge would also have served to support defendant's conviction of taking indecent liberties with a child. (See Ill. Rev. Stat. 1979, ch. 38, par. 11—4.) Because the jury undoubtedly would have heard the same evidence even if defendant had not been charged with rape, we consider the failure to direct a verdict to be harmless error beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

Another ground upon which defendant challenges his

convictions concerns the trial court's refusal to call Carmen Hernandez as a court's witness. Prior to trial, defense counsel, accompanied by an investigator from the public defender's office, visited the Hernandez residence for the purpose of interviewing Miguel Hernandez. Mr. Hernandez testified that he had admitted the two men into his home because he initially thought that they represented an insurance company and he denied telling defense counsel that he had lost consciousness immediately after being shot and that defendant had remained just inside the front door of the store. Carmen Hernandez, who was married to Miguel Hernandez, was called to testify by defendant. She stated that she had not been at home when defense counsel and the investigator arrived to interview her husband but that when she arrived at home to find them there, she had translated a conversation between defense counsel and Miguel. Her testimony as to the substance of that conversation corroborated Miguel's testimony on the matter.

After Carmen Hernandez was excused as a witness, defense counsel sought to examine Thomas Hickey, his investigator, for the purpose of impeaching her testimony. A conference was held in chambers to determine the propriety of allowing Thomas Hickey to testify. Upon being informed that defense counsel had been surprised by Carmen Hernandez' corroboration of her husband and that Mr. Hickey was being called only to impeach her, the trial judge told defense counsel that he would not be allowed to impeach his own witness. Defense counsel then argued that Carmen Hernandez should be considered a court's witness and open to impeachment. The trial judge disagreed, but did allow defendant to make an offer of proof as to Mr. Hickey's testimony.

Defendant's contention that the trial court erred in failing to call Carmen Hernandez as a court's witness and in failing to permit her impeachment by Thomas Hickey's testimony is without merit. As this court recently noted, one

of the requirements for calling a court's witness is that the witness' testimony will directly relate to a material issue. (*People v. Pastorino* (1982), 91 Ill. 2d 178, 191. See also *People v. McKee* (1968), 39 Ill. 2d 265; *People v. Moriarity* (1966), 33 Ill. 2d 606; *People v. Siciliano* (1954), 4 Ill. 2d 581, *cert. denied* (1955), 349 U.S. 931, 99 L. Ed. 1261, 75 S. Ct. 774.) Under the circumstances here, it is clear that Carmen Hernandez' testimony related only to the collateral issue of her husband's credibility and not to the innocence or guilt of defendant. The trial court did not err in denying defendant's belated request in chambers to characterize her as a court's witness. Furthermore, although we have since amended our rules to allow a party to impeach his own witness (see 87 Ill. 2d R. 238), and therefore decline defendant's invitation to adopt Rule 607 of the Federal Rules of Evidence (Fed. R. Evid. 607), the trial judge correctly applied the long-standing prohibition against impeachment of one's own witness which was still in force at the time of trial. See, *e.g., Smith's Transfer Corp. v. Industrial Com.* (1979), 76 Ill. 2d 338, 349; *Rockwood v. Poundstone* (1865), 38 Ill. 199, 201. See generally 3 J. Wigmore, Evidence sec. 896 (1940). *Cf. Wisniewski v. Shimashus* (1961), 22 Ill. 2d 451.

Defendant's final challenge to his convictions rests upon his assertion that the trial judge displayed a "predetermined" and "unsympathetic" attitude toward him and his counsel which intimidated counsel, causing the defense to be both hurried and limited. Although the trial judge criticized defense counsel on several points when the jury was not present and occasionally evinced a brusque manner toward both the prosecution and defense, the record does not reflect any prejudicial attitude or conduct on his part. Furthermore, the record lends no support to an argument that defense counsel was intimidated or that they conducted their defense effort in other than a deliberate and resolute manner.

We turn now to a consideration of those points on which defendant challenges his sentence of death. Raised first is defendant's contention that the Illinois death penalty statute is unconstitutional because it does not provide the jury with any guidance as to what weight to assign the various factors in aggravation and mitigation. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1.) Defendant also argues that the statutory language directing the court to impose the death penalty if the jury determines unanimously that "there are no mitigating factors sufficient to preclude the imposition of the death sentence" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g)) is unconstitutionally vague. An extended discussion of these arguments is unnecessary because this court has already held that neither the language employed nor the absence of specific weights in connection with the factors renders the statute unconstitutional. *People v. Brownell* (1980), 79 Ill. 2d 508, 534, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59. See also *People v. Lewis* (1981), 88 Ill. 2d 129, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307.

Defendant also urges that the statute's failure to require juries to employ a reasonable-doubt standard when finding that there are no mitigating factors sufficient to preclude the death sentence violates his right to due process. We note at the outset that our opinion in *People v. Free* (1983), 94 Ill. 2d 378, considered this issue to be resolved in *People v. Brownell* (1980), 79 Ill. 2d 508. (94 Ill. 2d 378, 421.) In any event, defendant's argument misapprehends the nature of the sentencing hearing provided under Illinois law. Due process requires that the State prove defendant's guilt beyond a reasonable doubt (see *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068), and our statute also requires the jury to find beyond a reasonable doubt that one or more of the statutory aggravating factors are present before a defendant becomes eligible for the death sentence (Ill. Rev. Stat. 1979, ch. 38,

par. 9—1(f); *cf. Gregg v. Georgia* (1976), 428 U.S. 153, 196-97, 49 L. Ed. 2d 859, 887-88, 96 S. Ct. 2909, 2936). During the sentencing stage of a criminal proceeding, however, society is no longer concerned exclusively with a defendant's culpability; rather, the focus is legitimately broadened to include other considerations such as the offender's character and propensities. (See *Gregg v. Georgia* (1976), 428 U.S. 153, 189, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932, quoting *Pennsylvania ex rel. Sullivan v. Ashe* (1937), 302 U.S. 51, 55, 82 L. Ed. 43, 46, 58 S. Ct. 59, 61.) The differing purpose of the sentencing phase of criminal proceedings has been held to justify a departure from the traditional rules governing evidentiary matters. (See, *e.g., People v. La Pointe* (1981), 88 Ill. 2d 482; *People v. Adkins* (1968), 41 Ill. 2d 297.) Convicted defendants are not entitled to any particular sentence, and because the only purpose of the aggravation and mitigation phase is to insure that the sentencing body exercises its discretion in an informed manner (*People v. Jones* (1982), 94 Ill. 2d 275), we do not consider it necessary or desirable to inject a reasonable-doubt standard into the balancing process. The Supreme Court has approved sentencing schemes which, like that established by the Illinois statute, provide for a balancing of aggravating and mitigating factors without employing the reasonable-doubt standard. (See *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909; *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960.) We agree with the decisions of our appellate court and courts in other jurisdictions which have held that due process does not require the State to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. *State v. Bolder* (Mo. 1982), 635 S.W.2d 673, *State v. Schad* (1981), 129 Ariz. 557, 633 P.2d 366; *People v. Frierson* (1979), 25 Cal. 3d 142, 599 P.2d 587, 158 Cal. Rptr. 281; *State v. Pierre* (Utah 1977), 572 P.2d 1338, *cert. denied* (1978), 439 U.S. 882, 58 L. Ed.

2d 194, 99 S. Ct. 219; *People v. Perez* (1981), 101 Ill. App. 3d 64; *People v. Peddicord* (1980), 85 Ill. App. 3d 414; *People v. Mays* (1980), 80 Ill. App. 3d 340. See also *State v. Pritchett* (Tenn. 1981), 621 S.W.2d 127; *State v. Watson* (1978), 120 Ariz. 441, 447, 586 P.2d 1253, 1259, *cert. denied* (1979), 440 U.S. 924, 59 L. Ed. 2d 478, 99 S. Ct. 1254.

We have considered the cases cited by defendant in support of his argument that due process requires using the reasonable-doubt standard throughout the death sentence hearing. With the exception of *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, and *Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197, those cases all concern the applicability of the reasonable-doubt standard at the guilt phase of criminal proceedings and do not provide support for defendant's position. Although *Woodson* and *Gardner* involve reversals of death sentences, they, too, are inapposite. In *Woodson,* the Supreme Court held that North Carolina's mandatory death penalty for first-degree murder violated the eighth and fourteenth amendments. This holding rested on the North Carolina statute's failure to provide for the individualized consideration necessary to arrive at a reliable determination that the death sentence was appropriate in each case. Similarly, the question of whether the reasonable-doubt standard should be applied to jury findings concerning aggravating and mitigating factors was not an issue in *Gardner,* where the Supreme Court held that a Florida court's imposition of the death penalty based on confidential information in a presentence report not made available to the defendant violated due process. No decision of the Supreme Court requires that Illinois apply a reasonable-doubt standard in all phases of a sentencing hearing, and we are unpersuaded that our statute providing otherwise is invalid.

Defendant urges that the Illinois death penalty statute

is constitutionally infirm as applied to the facts in this cause, arguing that it provides that the death penalty may be imposed upon defendant despite the fact that his convictions were based on accountability and there was no evidence that defendant actually killed or intended the death of another person.

The sentencing jury found defendant eligible for the death penalty under section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)). Section 9—1(b) provides in relevant part:

> "Aggravating factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:
>
> \*   \*   \*
>
> 3. the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts."

Because the jurors were instructed that they could return guilty verdicts on the charges if they found that defendant had actually committed the crimes or, alternatively, if they found that he was legally responsible for the conduct of the perpetrator under the Illinois accountability statute (see Ill. Rev. Stat. 1979, ch. 38, pars. 5—1 through 5—3), defendant claims that the general verdicts of guilt returned against him cannot be regarded as· a finding that he personally committed the murders. Defendant also contends that the evidence, even when viewed in the light most favorable to the State, does not support a finding that he either committed or intended the murders, but establishes only that he participated in a series of felonies. Citing *En-*

*mund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, as well as our own recent decisions in *People v. Jones* (1982), 94 Ill. 2d 275, and *People v. Tiller* (1982), 94 Ill. 2d 303, defendant argues that the imposition of the death penalty in his case is disproportionate to the offenses for which he was sentenced and thus violates the eighth amendment.

We note initially that we cannot agree with defendant's unqualified statement that he was convicted on the basis of accountability. Rather, the most that can be said is that the general verdict returned by the jury fails to reveal whether the jury found him guilty of actually killing anyone or whether he was convicted on the basis of accountability. Even if we were to assume that defendant's murder convictions rested in part or completely on a theory of accountability, the imposition of the death sentence under the circumstances present here was permissible. This court has already held that the death penalty may be constitutionally imposed for murder convictions based on accountability (*People v. Ruiz* (1982), 94 Ill. 2d 245), and defendant's citations to our recent decisions in *Jones* and *Tiller* are inapposite. The death sentences which we reversed in those cases were imposed in violation of *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, because it was clear in each instance that the murder convictions for which those death sentences had been imposed resulted from deaths not caused or intended by the defendants. In holding that a death sentence could not constitutionally be imposed following a conviction for felony murder when the defendants had not intended the victims to be killed, the Supreme Court stated in *Enmund*:

> "[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself *kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.* We

have concluded, along with most legislatures and juries, that it does not." (Emphasis added.) 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376-77.

As this court recently reiterated, it is well established that a fact finder may infer the intent to take a life from a defendant's acts and the circumstances surrounding the commission of the offense. (*People v Ruiz* (1982), 94 Ill. 2d 245, 263. See also *People v. Jones* (1979), 81 Ill. 1, 9-10; *People v. Koshiol* (1970), 45 Ill. 2d 573, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209 (partially overruled in *People v. Nunn* (1973), 55 Ill. 2d 344, 349); *People v. Coolidge* (1963), 26 Ill. 2d 533.) Viewed in the light most favorable to defendant, the uncontroverted evidence presented at trial concerning defendant's conduct at the grocery store, coupled with the physical evidence, clearly demonstrates that defendant intended that lethal force would be employed. (*Cf. Enmund v. Florida* (1982), 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376-77.) The methodical execution of the grocery store shootings and robbery, with Roger Llaguna moving immediately to kill any potential witnesses in the rear of the store while defendant held those persons in the front at bay before shooting one of them himself, coupled with the defendant's lack of hesitation when shooting Dorothy Oszkandy and Walter Lesniak at the tavern, leads us to conclude that the circumstances here are completely different from those in *Jones* or *Tiller*, where the defendants were not shown to have planned or participated in the murders for which their death sentences were reversed.

We next consider defendant's argument that his death sentence must be reversed because the jury was improperly and inadequately instructed at the sentencing hearing. In support of this assertion, defendant contends that an instruction tendered by the State and given at the hearing was defective in that it failed to inform the jurors that they could consider mitigating factors other than those

listed in the statute and presented to them by the court. Defendant additionally argues that the trial judge erred in refusing to give an instruction tendered by the defense describing aggravating and mitigating factors. The pertinent part of the instruction actually given provided:

"Aggravating factors are those facts or circumstances which provide reasons for imposing the death penalty. Aggravating factors include, but need not be limited to, the required statutory aggravating factor in the previous instruction.

Mitigating factors are those facts or circumstances which provide reasons for imposing a sentence less than the death penalty. (Mitigating factors may include:)

\* \* \*

6). any other factors or circumstances that provide for imposing less than the death penalty."

In our opinion, this instruction clearly informed the jurors that their consideration need not be limited to the statutory examples of mitigating factors. Defendant's instruction contained the same language directing the jury to consider any other mitigating facts and, because it was substantively identical in that respect, the trial judge's refusal to give the instruction did not constitute error.

In addition, we note that although defense counsel objected to certain aspects of the State's instruction, the ground upon which it is now challenged was not brought to the attention of the trial judge. This court has consistently held that specific objections waive all grounds not specified and "one may not raise on appeal a question which was not properly presented to the trial court." (*People v. Curry* (1973), 56 Ill. 2d 162, 170. See also *People v. Free* (1983), 94 Ill. 2d 378, 419; *People v. Pastorino* (1982), 91 Ill. 2d 178, 192; *People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Holloway* (1981), 86 Ill. 2d 78, 91.) An exception to the waiver doctrine is provided by our Rule 615(a) (73 Ill. 2d R. 615(a)), but that exception is expressly limited to cases in which the plain error affected substantial rights. (*Cf.*

*People v. Szabo* (1983), 94 Ill. 2d 327, 354-55.) Our decisions have held that while the plain error doctrine may come into play when reviewing a sentencing hearing involving the death penalty (*People v. Szabo* (1983), 94 Ill. 2d 327, 355), issues which were waived will be addressed only when the evidence is closely balanced. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576; *People v. Howell* (1975), 60 Ill. 2d 117, 121; *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.) A review of the evidence presented in aggravation and mitigation disposes of any contention that this evidence was closely balanced.

The other two instructions which defendant claims were improperly refused would have instructed the jury to consider the objective of restoring the offender to useful citizenship when determining the appropriate sentence, in accordance with article I, section 11, of the 1970 Illinois Constitution. In *People v. Gaines* (1981), 88 Ill. 2d 342, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285, the defendant attacked his death sentence on the grounds that the death penalty statute violated article I, section 11, of the 1970 Illinois Constitution by failing to require the sentencing body to make a determination that there was no rehabilitative potential and that no such finding was made. As was true in *Gaines*, defendant failed to present any evidence which would support a finding of rehabilitative potential. Accordingly, although the trial judge's characterization of defense counsel's proposed instructions on rehabilitative potential was unwarranted, the judge's refusal to give the instructions, if improper, was at most harmless error. *Cf. People v. Ellis* (1973), 53 Ill. 2d 390, 395-96; *People v. Nelson* (1968), 41 Ill. 2d 364, 367; *People v. Muniz* (1964), 31 Ill. 2d 130, 138.

Defendant claims that his sentencing hearing was also tainted by inflammatory remarks made by the prosecutor. During his closing argument, the prosecutor told the jurors that they should disregard defense counsel's assertion that

the court would sentence defendant to life imprisonment without parole if they voted against the death penalty; rather, argued the prosecutor, defendant would find a way to get out on parole and kill again. This court has held that a resulting death sentence must be reversed when a prosecutor's remarks in a death sentence hearing diverted the jury's consideration away from a strict consideration of aggravating and mitigating factors. (*People v. Szabo* (1983), 94 Ill. 2d 327; *People v. Walker* (1982), 91 Ill. 2d 502.) Comments concerning the availability of parole, however, when invited and in the absence of any indication of an effect on the sentencing jury, do not require reversal. (*People v. Walker* (1982), 91 Ill. 2d 502, 515; *People v. Myers* (1966), 35 Ill. 2d 311, 335, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752.) Defense counsel's assurances to the jury that the trial judge would sentence defendant to life imprisonment without the possibility of parole served to invite the prosecutor's comments. Consequently, the prosecutor's closing argument provides no basis for reversing the death sentence.

In its brief, the State draws to our attention the fact that defendant was sentenced only on his murder conviction and requests that we remand the cause in order to allow the trial court to sentence defendant on his other convictions. The record offers no explanation as to why sentences on those convictions were not imposed and, as we noted above when addressing defendant's challenge to his rape conviction, judgments of criminal conviction are generally not reviewable until finalized by the imposition of a sentence. As is true in conjunction with a conviction or convictions which are properly before us, we may remand the cause for sentencing. *People v. Scott* (1977), 69 Ill. 2d 85.

For the reasons stated, we reverse the circuit court's judgment of conviction on the rape charge, affirm the judgment on all of the other convictions, as well as the imposi-

tion of the death sentence, and remand the cause with directions to impose sentences on those convictions for which no sentence was imposed. It is further ordered that the sentence of death be executed on Wednesday, November 16, 1983.

*Affirmed in part and reversed*
*in part; cause remanded,*
*with directions.*

JUSTICE SIMON, dissenting:

I would vacate the sentence of death rendered against the defendant and remand for a new sentencing hearing because the Illinois death penalty statute is unconstitutional and because of prejudicial remarks made by the prosecutor at the death penalty hearing.

I continue to adhere to the position that I stated in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting). The Illinois death penalty statute is unconstitutional because it "contains no directions or guidelines to minimize the risk of wholly arbitrary and capricious action by the prosecutor in either requesting a sentencing hearing or in not requesting a sentencing hearing." (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 559 (Ryan, J., Goldenhersh, C.J., and Clark, J., dissenting).) A majority of the justices presently sitting on this court has, at one time or another, and most recently on November 13, 1981, when *People v. Lewis* was filed, recognized that the statute is unconstitutional. I believe that the importance of the issue to the public and to the defendant requires that I adhere to the beliefs I expressed in *Lewis* and refuse to follow the doctrine of *stare decisis* in this matter as my colleagues did in that case.

For this reason, I would declare the statute unconstitutional, vacate the sentence of death, and remand for the imposition of an alternative sentence.

Even if the statute were constitutional, the prosecutor's

prejudicial remarks about the possibility of parole at the defendant's death sentencing hearing require that we vacate the sentence of death and remand for a new hearing. This court allowed the prosecutor to argue, over objection, that the defendant, if given life imprisonment without parole, would "find a way to get a parole and *** be out on the street again and he'll kill again."

We have held that the prosecutor must not interject extraneous issues into the death penalty hearing which, through prejudice or confusion, divert the jury's attention from a careful consideration and weighing of the aggravating and mitigating factors in the defendant's case. *People v. Szabo* (1983), 94 Ill. 2d 327, 363-67; *People v. Walker* (1982), 91 Ill. 2d 502, 513; see also *People v. Davis* (1983), 95 Ill. 2d 1, 62-63 (Simon, J., dissenting).

In *Szabo* we vacated the sentence of death because the prosecutor referred to the possibility of parole in his closing argument. (94 Ill. 2d 327, 365-67.) The prosecutor made comparable comments in this case, but the majority, holds that the comments were invited by defense counsel's reference to the option of a life sentence without possibility of parole. Yet in *Szabo* we held that precisely the same type of reference to sentencing options *did not warrant* the prosecutor's prejudicial and inflammatory reference to the possibility of parole:

> "The possible terms of parole should not have been interjected by either counsel in informing the jury of the sentencing alternatives available to the court. However, the State's Attorney could not use defense counsel's statements as a convenient springboard to suggest to the jury that a possible decision 'made by some bureaucrat with very little standards' could allow Szabo to be free again some day in the future. The comments of the State's Attorney were not invited by defense counsel's reference to the court's sentencing alternatives. Such highly prejudicial remarks on the part of the prosecuting attorney inevitably diverted the jury's attention from con-

sidering the aggravating and/or mitigating factors as they properly reviewed the character and record of the defendant and the facts and circumstances surrounding the offense." (94 Ill. 2d 327, 366.)

The majority offers no explanation for its retreat from *Szabo* and the decision we made there to clearly limit prejudicial rhetoric in penalty hearings.

I believe all judges appreciate the seriousness of a death sentencing hearing. It "is not intended to provide a soap box on which counsel can prey upon the fears of the jurors that the the defendant may soon walk the streets again in search of another victim." (*People v. Szabo* (1983), 94 Ill. 2d 327, 367.) I see no reason why this court should not continue to heed the warning it gave in *Szabo* concerning the limits of rhetoric in death penalty hearings.