THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY FLORES, Defendant-Appellant.

First District (5th Division) No. 1—91—0374

Opinion filed November 5, 1993.

Thomas R. Bennett & Associates, of Chicago (H. Wycliffe Martin, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Susan S. Wigoda, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a trial by jury, defendant, Johnny Flores (Flores), was convicted of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) and sentenced to 40 years' imprisonment. Flores asserts that he is entitled to a new trial because: (1) the prosecutor misstated the evidence during closing argument; (2) the prosecutor made numerous prejudicial comments during closing argument; (3) the trial court erred in admitting evidence of conversations between a police detective and unidentified gang members; (4) the prosecutor repeatedly questioned a witness about improper matters despite sustained objections; and (5) the trial court erred in admitting testimony regarding a witness' identification of Flores in a lineup over the phone several days after the lineup had been held.

We affirm.

BACKGROUND

On November 22, 1989, at approximately 9:30 p.m., Scott Thurmond (Thurmond) and his friend Jeffrey Rhodes (Rhodes) were walking north on Central Park in the City of Chicago. Before going out that evening, Thurmond had consumed two beers. The two men had unsuccessfully attempted to purchase marijuana in the vicinity of Armitage and St. Louis Streets and were now walking back to Rhodes' residence.

As they approached the intersection of Central Park and Shakespeare, Thurmond observed a male and two females walking east on Shakespeare. The two groups approached each other at right angles, and at the closest point of intersection, they were seven to eight feet apart. Thurmond observed that the male was looking at them.

The trio had just passed Thurmond and Rhodes when the male turned around and said, "Disciple love." Thurmond and Rhodes

turned and looked in the direction of the speaker. Thurmond testified that Rhodes gave a two-word reply, "fuck you," and Thurmond said "we ain't about nothing." The male then pulled out a gun and fired two shots at them. After the shots were fired, the shooter and the females fled. Thurmond and Rhodes began running in the opposite direction of the shooter.

After they had run four city blocks to the corner of Hamlin and Fullerton, Rhodes collapsed in front of a restaurant/lounge called LaRosita. Thurmond unzipped Rhodes' jacket and saw that he was covered with blood.

Thurmond then ran into the bar and stated that he needed to use the phone. According to Thurmond, there was a man using the phone who told him that he could not use the phone. Thurmond told the man, "[f]uck you, I got to use the phone. My friend got shot." He testified that the man punched him in the face three times. Thurmond then ran outside and flagged down a police car.

Juan Valdez, the owner of the restaurant, testified that Thurmond walked in and started screaming, "Spik motherfucker shot my friend." In the opinion of Valdez, Thurmond smelled of alcohol and appeared drunk. On cross-examination, however, Valdez conceded that Thurmond was acting in a manner consistent with someone who had just witnessed a shooting. Valdez stated that he was afraid that Thurmond might use the knife he saw protruding from Thurmond's side so he took it away from him. Valdez testified that he called the police and then escorted Thurmond outside.

Officer Villareal testified that he and his partner were responding to a call for help at the restaurant when they saw Thurmond run out into the street and flag their patrol car. When Villareal reached the restaurant, he saw Rhodes leaning up against the building in obvious pain; Rhodes was incoherent and unable to speak to Villareal. An ambulance arrived less than a minute later and took Rhodes to Illinois Masonic Hospital, where he died shortly thereafter without speaking to anyone.

Villareal asked Thurmond to go with him on foot to the place where the shooting had occurred. Thurmond led Villareal to approximately 3759 West Palmer near Hamlin and indicated that this was the location of the shooting. During this walk, Thurmond gave the officer a description of the offender based upon his still fresh recollection. Thurmond stated that the individual who shot Rhodes was approximately the same height and weight as himself; he informed the officer that he was about 5 feet 6 inches and 135 pounds. He also told Villareal that the offender wore a jacket with a blue hood and jeans, and he had black hair and a little mustache.

After they reached the location which Thurmond thought was the scene of the crime, Villareal radioed for his partner to come and pick them up. The officers and Thurmond then went to the hospital. Later, Thurmond left the hospital with detectives and went to the police station.

While at the station, Thurmond looked through books containing photographs of possible suspects. During this time, Thurmond told the police that he wasn't sure if the location at Hamlin and Palmer was where the incident had happened. At this point, the officers and Thurmond got back into the police vehicle and drove around until Thurmond was able to identify the area near Central Park and Shakespeare as the proper location. Thurmond then returned to the station, where he looked at additional books of photographs but did not select any of the photographs. The record does not indicate whether a photograph of Flores was among those viewed by Thurmond on the night of the shooting.

In March 1990, Detective Guevara, a gang crimes specialist, became involved in the investigation of the Rhodes homicide. During his investigation, he talked with numerous gang members about the murder. After conversing with the unnamed gang members, Guevara contacted Detective Paulnitsky on March 29, 1990, and gave him a single name.

That same day, Paulnitsky drove out to Thurmond's house to show him five photographs. Paulnitsky stated that he had attempted to present Thurmond with photographs of individuals who had the same characteristics: white, male Hispanics around 19 years of age. Paulnitsky met with Thurmond in his unmarked car in front of Thurmond's house, since there were guests in Thurmond's residence. Paulnitsky spread the photographs on his briefcase and asked Thurmond if he could identify anyone. Thurmond surveyed the photographs and selected the picture of Flores.

On March 31, 1990, Paulnitsky contacted Thurmond and asked him to view a lineup. Flores participated in the lineup voluntarily. Thurmond was brought to the police station in a police car and went into a viewing room with Paulnitsky and another officer. The testimony regarding Thurmond's reaction at the lineup was somewhat disputed. At the hearing on Flores' motion to quash and suppress, Paulnitsky testified that as he pulled open the curtains to begin the lineup, Thurmond passed out. At trial, Paulnitsky stated that the individuals in the lineup were asked to stand, and as they stood, Thurmond suddenly became pale, his eyes started rolling back, and he started to collapse. Paulnitsky explained that he had to assist Thurmond into a chair because he was distraught and incoherent.

Paulnitsky believed that Thurmond had passed out that day and he photographed Thurmond while he was still distraught in case a question arose about why he had stopped the lineup.

In contrast, Thurmond testified that he watched the four individuals in the lineup step forward one at a time, and then started to cry and left the room. He stated that he was upset at that time and he was unable to tell the police anything.

On April 3, 1990, several days later, Thurmond telephoned Paulnitsky and stated that he wanted to view another lineup so that he could identify the offender. He also told Paulnitsky that he recognized the shooter in the previous lineup: the shooter was the person in the fourth position from his right. Paulnitsky testified that on the day of the lineup, Flores was standing in the fourth position from the right.

On the evening of April 3, a second lineup was held. Again, Flores voluntarily participated in the lineup. At the lineup, Thurmond identified Flores as the shooter. The officers arrested Flores and charged him with the murder of Rhodes.

Following a trial by jury, Flores was convicted of first degree murder and sentenced to 40 years in prison. His request for post-trial relief was denied and this appeal followed.

ANALYSIS

I

Flores first contends that he was deprived of a fair trial because the prosecutor misstated the evidence during closing argument.

During closing argument, the prosecutor stated that the reason that Thurmond did not pick out a photograph of Flores prior to March 29, 1990, four months after the shooting, was because Flores' photograph was not included in the ones he had viewed up to that point. As Flores correctly points out, however, there is no evidence in the record to support this statement. Also during closing argument, the prosecutor stated that Thurmond initially described the shooter to Paulnitsky as a young Hispanic male. Again, the record belies the prosecutor's assertion.

Flores concedes that he has waived this issue because he failed to object to the error at trial and he failed to raise the issue in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) However, he urges this court to take notice of this error under the plain error doctrine. The plain error doctrine may be invoked in criminal cases to review an error which has not been properly preserved for review under two circumstances: (1) where the evidence is closely balanced; or (2) where the error is of such magnitude that the defendant was denied a fair trial. *People v. Young* (1989), 128 Ill. 2d 1, 46-47.

The first prong of the plain error doctrine is not applicable in this case; the evidence was not closely balanced. The State presented the testimony of an eyewitness who identified Flores as the shooter on four separate occasions. On March 29, 1990, Thurmond was presented with a photo spread of suspects and he identified Flores as the man who shot Rhodes. On April 3, 1990, several days after the initial lineup where he became distraught, Thurmond called Paulnitsky and told him that the man in the fourth position in the lineup (Flores) was the offender. On April 3, 1990, Thurmond viewed a second lineup and identified Flores as the shooter. Finally, during trial, Thurmond made an in-court identification of Flores. Because of the strong eyewitness testimony, we do not regard the evidence as closely balanced.

Under the second prong of the plain error doctrine, an error which was not properly preserved may be reviewed if it is so fundamental and of such magnitude that the accused was denied a fair trial. (*People v. Harrett* (1990), 137 Ill. 2d 195, 215.) In the case at bar, although the prosecutor's statements were improper, in light of the State's strong eyewitness evidence, it cannot be said that Flores was deprived of a fair trial. Moreover, the court properly instructed the jury that closing arguments are not evidence and that any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

## II

Flores next contends that the prosecutor made numerous inflammatory statements during closing argument that served to prejudice the jury and deny him a fair trial.

In support of his claim, Flores initially directs our attention to the following statements concerning gangs and gang violence:

"But most of all its the gangs against the rest of society.

*** [C]itizens that tell gang * * * members I don't want nothing to do with you like Jeffrey Rhodes did, are subject to death.

The message the Defendant gave Scott and Jeffrey is for everyone. Man or Woman."

Flores argues that these statements were improper because there is no evidence in the record which linked him to a gang. He contends that the statements were made solely to appeal to the jury's fear and prejudice. We disagree.

■ Generally, it is not error for the prosecutor to comment on the evil results of gang-related activity where such activity is related to the crime charged. (*People v. Smith* (1990), 141 Ill. 2d 40, 62; *People v. Silva* (1992), 231 Ill. App. 3d 127, 137-40.) In this case, Thurmond testified that on November 22, 1989, immediately before shooting

Rhodes, Flores said the words "Disciple love." Guevara, the gang crimes specialist, testified that the words "Disciple love" indicate affiliation with a gang known as the Disciples. Thus, there is evidence in the record which indicates that the crime was gang-related. (See *Silva*, 231 Ill. App. 3d at 137-40.) Because the uncontradicted evidence was that Flores, prior to the shooting, uttered a phrase that was identified as a gang slogan, the prosecutor did not commit error by emphasizing the gang-related nature of the crime in his closing remarks. See *Silva*, 231 Ill. App. 3d at 140.

Nor can it be said that the prosecutor unfairly appealed to the jury's fears and prejudices. The prosecutor's comments dwelt upon the evil results of crime and, as such, were proper. See *People v. Owens* (1984), 102 Ill. 2d 88, 105-06.

Flores next directs our attention to statements urging the jury to send a message to Flores and other gang members in the city. During closing argument the prosecutor said:

> "Your verdict will send a message to Johnny Flores and the other gang members in the city.
>
> * * *
>
> Your verdict will tell them that you don't condone it, and you want it to end."

Although we are not impressed with this portion of the prosecution's argument, we find no error in these remarks. Our supreme court has repeatedly held that "[i]t is entirely proper for the prosecutor to dwell on the evil results of crime and to urge the fearless administration of the law." *People v. Harris* (1989), 129 Ill. 2d 123, 159; see *People v. Benedik* (1974), 56 Ill. 2d 306, 310-11; *People v. Wright* (1963), 27 Ill. 2d 497, 500.

■ Relying on *People v. Ray* (1984), 126 Ill. App. 3d 656, Flores next argues that the cumulative effect of the prosecutor's improper remarks deprived him of a fair and impartial trial. We disagree.

*Ray* is readily distinguishable from the case at bar. As this court observed in *Ray*, the prosecutor's actions in that case "read like a veritable hornbook of 'do nots.' " (*Ray*, 126 Ill. App. 3d at 663.) In *Ray*, the prosecutor attacked the professional integrity of defense counsel, charging him with "lying" 16 times, as well as with trying to "confuse" and "intimidate" the jury. He misstated the applicable law and impermissibly intimated the existence of favorable State evidence which was rendered inadmissible due to defense counsel's objections. He commented on the defendant's failure to testify and intimated that defendant had a prior criminal history. Finally, he suggested that the defendant had manipulated his constitutional rights to escape conviction. *Ray*, 126 Ill. App. 3d at 660-62.

492

In the instant case, unlike *Ray*, the prosecutor's conduct was not so egregious as to "create[ ] an atmosphere inimical to the even-handed dispensation of justice." (See *Ray*, 126 Ill. App. 3d at 659-60.) Flores was not deprived of a fair trial by the cumulative effect of the prosecutor's remarks.

III

Flores next argues that the trial court erred in overruling his objections to testimony from Detective Guevara regarding conversations with unidentified gang members who were not present in court, and thereby deprived him of his constitutional right to confront his accusers.

Over objections of defense counsel, Guevara related that in late March 1990, he investigated the murder of Rhodes by talking to numerous unnamed gang members. He then testified that after he had these conversations, he relayed a single name to Paulnitsky. Flores points out that the jury had previously heard from Thurmond that on March 29, 1990, Paulnitsky showed up "out of the blue" four months after the shooting. Therefore, according to Flores, the jury was presented with the impermissible inference that, solely on the basis of conversations between Guevara and the unnamed gang members, Paulnitsky was able to provide Thurmond with a picture which Thurmond would identify as the offender.

■ We find no error in the trial court's rulings. It is well settled that a police officer may testify about steps he or she has taken during the investigatory process, including the existence of conversations, without violating the hearsay rule. (See *People v. Jones* (1992), 153 Ill. 2d 155, 159-60; *People v. Gacho* (1988), 122 Ill. 2d 221, 248.) As the supreme court stated in *People v. Henderson* (1990), 142 Ill. 2d 258:

> "[T]estimony recounting the steps taken in a police investigation is admissible and does not violate the sixth amendment, even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements and so inform the jury that they told the police that defendant was responsible for the crime." (*Henderson*, 142 Ill. 2d at 304.)

In the instant case, Guevara merely recounted the steps taken during his investigation of the Rhodes murder. The testimony was based upon his personal knowledge of the investigation. Furthermore, Guevara did not disclose the substance of his conversations with the unnamed gang members. As such, his testimony was not inadmissible hearsay and did not encroach upon Flores' sixth amendment right to confront his accusers. (See *Gacho*, 122 Ill. 2d at 248.) Therefore, we

conclude that the trial court did not err in admitting Guevara's testimony.

## IV

Flores next asserts that the prosecutor's persistence in asking Paulnitsky improper questions regarding the police investigation despite sustained objections and a motion *in limine* deprived him of a fair trial and constituted reversible error.

In ruling on Flores' motion *in limine,* the trial court relied on the supreme court's decision in *Gacho* (122 Ill. 2d 221) and held that testimony regarding the out-of-court identification of Flores by unknown persons would not be allowed. *Gacho* holds that a police officer may testify to the fact that he had conversations with unnamed witnesses as part of his investigatory procedure, but he may not testify to the *contents* of the conversations. (*Gacho,* 122 Ill. 2d at 247-49.) In this case, Guevara spoke with unnamed gang members, who apparently implicated Flores, and then related his findings to Paulnitsky. Under *Gacho,* Paulnitsky could testify that as part of his investigation, he spoke with gang crimes specialist Guevara, but just as Guevara could not reveal the contents of his conversations with the unnamed gang members, Paulnitsky could not reveal the contents of these conversations. Thus, the trial court's ruling on Flores' motion *in limine* was proper.

Despite the trial court's ruling, however, the prosecutor relentlessly pursued this area of inquiry during his examination of Paulnitsky:

"Q. When you had that conversation with [Guevara] on that date did he give you any information?

A. Yes.

Q. Did that information contain the identity of any person?

MS. PANTLE: Objection.

THE COURT: Sustained.

* * *

Q. After your conversation with Detective Guevara did your investigation focus on any particular individual?

A. Yes.

MS. PANTLE: Objection.

THE COURT: Sustained.

Q. After your conversation with Detective Guevara what did you first do?

A. After talking to the other police officer I received the name of the defendant—

MS. PANTLE: Objection.

THE COURT: Sustained, the jury is instructed to disregard.

Q. Let me ask you this way: After talking with Detective Guevara did you call the identification section of the Chicago Police Department?

MS. PANTLE: Objection.

THE COURT: Sustained.

Q. In your words, Detective, after talking with Detective Guevara did you obtain a photograph of anyone?

A. Yes.

Q. Who was that a photograph of that you obtained?

MS. PANTLE: Objection.

THE COURT: Sustained as to that form. Sustained.

* * *

Q. Whose photograph did you attempt to obtain and did you, in fact, obtain?

MS. PANTLE: Objection.

THE COURT: Objection sustained counsel. This is about the third time.

* * *

Q. And did you obtain one of those photographs in response to your conversation with Detective Guevara?

MS. PANTLE: Objection.

THE COURT: Sustained Counsel. This is about the fourth time. Watch it.

* * *

Q. When you collected these photographs to show Scott Thurmond the photograph of one or one photograph was a suspect, is that correct?

MS. PANTLE: Objection.

THE COURT: Sustained.

Q. There were four photographs that were nonsuspects in the case, is that correct?

MS. PANTLE: Objection.

THE COURT: That's sustained, Mr. McCarthy.

Q. When you obtained the photographs did you obtain them in a particular order of time, one first and then the others?

THE COURT: (without objection) Sustained. That's irrelevant.

* * *

Q. What was your purpose in attempting to have all five photographs portray male white Hispanics around 19 years of age?

A. The individual I had in mind, the suspect—

MS. PANTLE: Objection.

THE COURT: That's sustained."

■ We agree that the prosecutor's questions were improper. Generally, " '[i]f a timely objection is made at trial ***, the court can, by sustaining the objection or instructing the jury to disregard the answer or remark, usually correct the error.' " (*People v. Cisewski* (1987), 118 Ill. 2d 163, 178, quoting *People v. Carlson* (1980), 79 Ill. 2d 564, 577; see also *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 785.) Assuming, however, that sustaining the objections did not cure the error in this case, the improper questioning does not amount to reversible error. The standard for determining if an error is harmless or requires reversal is whether the error is harmless beyond a reasonable doubt. (*People v. Glover-El* (1981), 102 Ill. App. 3d 535, 541.) "Error may be harmless because the error itself is inconsequential or, if the error is of a more serious nature, it may be deemed harmless when balanced against the strength of the State's evidence." (*Glover-El*, 102 Ill. App. 3d at 541; see *People v. Morrow* (1982), 104 Ill. App. 3d 995, 1006; *People v. Cooper* (1989), 188 Ill. App. 3d 971, 973.) In the instant case, the State presented strong eyewitness testimony which demonstrated beyond a reasonable doubt that Flores was the man who shot and killed Jeffrey Rhodes. In our view, the result would not have been different without the improper questions.

## V

Finally, Flores asserts, without citation to authority, that the trial court erred in denying his motion to suppress testimony regarding Thurmond's identification of Flores via telephone several days after the lineup had been held. Flores argues that this evidence should not have been admitted because Thurmond did not have a chance to see the persons who stood at the lineup. He relies on the fact that during the evidentiary hearing, Paulnitsky testified that as he opened the curtains during the lineup, Thurmond passed out. Paulnitsky testified that Thurmond was distraught and incoherent at this time, and that Thurmond was unable to identify anyone.

The trial court's denial of a motion to suppress will not be overturned unless it is manifestly erroneous. (*People v. Garcia* (1983), 97 Ill. 2d 58, 74; *People v. Harris* (1991), 220 Ill. App. 3d 848, 860.) In reviewing the trial court's ruling on a motion to suppress, we may consider testimony adduced at trial as well as the suppression hearing. *People v. Melock* (1992), 149 Ill. 2d 423, 433; *People v. Redd* (1990), 135 Ill. 2d 252, 289.

Evidence of a pretrial identification must be excluded at trial only where (1) the procedure was unnecessarily suggestive and (2)

there was a substantial likelihood of misidentification. (*People v. Hartzol* (1991), 222 Ill. App. 3d 631, 642; *People v. Sykes* (1987), 161 Ill. App. 3d 623, 633.) In this case, Flores does not contend that the procedure was unnecessarily suggestive or that there was a likelihood of misidentification. Instead, Flores maintains that Thurmond did not see the lineup at all, thereby attacking the credibility of the witnesses.

■ Questions concerning the credibility of witnesses are best resolved by the trial judge (*Redd*, 135 Ill. 2d at 289; *People v. Andras* (1992), 241 Ill. App. 3d 28, 37), and his determination will not be disturbed unless it is against the manifest weight of the evidence (*Andras*, 241 Ill. App. 3d at 37). Although Paulnitsky testified that Thurmond was unable to identify anyone at the lineup due to his condition, he also testified that Thurmond called him several days later and stated that he had recognized the fourth person in the lineup. Furthermore, at trial, Thurmond testified that he was able to view the participants in the lineup before he became too distressed to communicate. He also testified that he called the officers several days later and informed them that he recognized the fourth person on his right as the shooter. The trial court's findings were not against the manifest weight of the evidence, and we find no error in admitting testimony concerning the telephonic identification by Thurmond.

For all of the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.