THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARTIN SILVA, Defendant-Appellant.

First District (2nd Division)  No. 1—89—2614

Opinion filed June 23, 1992.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and John F. O'Grady, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Just before midnight on January 17, 1984, in a tavern in Chicago, David Moyet was killed and Ruben Velazquez was shot twice. A jury found defendant Martin Silva guilty of Moyet's murder and of the attempted murder and aggravated battery of Velazquez; he was sentenced to concurrent terms of imprisonment. In this appeal, defendant contends that he was denied a fair trial and urges us to reverse his convictions for the following reasons: (1) the State improperly bolstered its case by referring to statements of nontestifying witnesses; (2) the State preyed on the jury's sympathies by its improper empha-

sis on Moyet's survivors; (3) the State implied, without sufficient substantiation, that the crimes were gang-related; (4) the cumulative effect of these errors, even if harmless individually, prejudiced the jury; and (5) the court erroneously instructed the jury concerning attempted murder. For the reasons that follow, we affirm.

At trial, Moyet's wife testified first as the "life and death" witness. Ruben Velazquez testified next for the State. He and his wife, the niece of David Moyet, resided in the same building that the Moyets occupied. At about 6:30 p.m. on January 17, 1984, Velazquez agreed to accompany Moyet to visit the latter's cousin. The two men arrived at the cousin's home at around 6:30 or 7 p.m., and each drank a can of beer. After an hour or so, Moyet offered to introduce Velazquez to some other friends; the two then went to a tavern, where in the course of an hour or two, Velazquez had another beer while Moyet bought a round for the house. They then went to a tavern at 1852 Blue Island in Chicago, where Moyet bought another round and Velazquez had another beer. Some time later, Moyet suggested they order food from a taco stand about 10 feet north of the tavern. Because the night was cold, the two men returned to the tavern after they ordered their food and waited just inside the door. During the 20 minutes they were there, three men entered, including defendant. Velazquez had never before seen any of the three men. Approximately 10 other people were in the tavern.

According to Velazquez, defendant "bumped into" Moyet and "called a gang name, Ambrose, you know." Moyet and defendant "exchanged words," and Moyet "started arguing because [defendant] pushed him." Velazquez saw defendant put his right hand inside his pants at the waist. Thinking defendant was reaching for a gun, Velazquez punched him; defendant did not fall. Defendant drew a gun, pointed it at Moyet, and shot him. Defendant, who was 10 feet from Velazquez, then pointed the gun at him and fired; the bullet hit Velazquez's shoulder near the collarbone. Velazquez picked up a bar stool to protect his face, and he felt another bullet hit his finger. Velazquez threw aside the bar stool after he noticed that defendant had wounded one of his own friends, who had tried to stop the shooting. Defendant and his companions then left.

Altogether, Velazquez heard more than five shots. He saw no one other than defendant with a gun. He heard someone tell the owner of the tavern to pull out his gun, but the man did not do so. After being shot, Moyet, who had gone to the rear of the tavern but returned to the front, was bleeding from the neck.

Chicago police officer Ronald Guin testified that he arrived at the tavern in response to a call and saw Moyet's body lying on the floor, bleeding from the neck, about three or four feet from the entrance door. He saw "a trail of blood from the front of the tavern all the way to the back." He recovered two spent bullets and seven bullet casings from various locations inside and outside the building; he also found a bullet hole in the rear wall of the tavern, which was approximately 60 or 70 feet from the entrance.

Two other Chicago police officers also testified. Detective Bedford Eveland conducted a lineup in June 1988, more than four years after the shooting, at which Velazquez identified defendant. On cross-examination, Eveland denied that defendant had been wearing glasses on the night of the lineup or that he had asked defendant to remove his glasses. Sergeant James Antonacci, who investigated the shooting, testified that after he reviewed reports by other police officers, he interviewed Velazquez, Marco Alverez, whom defendant later named as his companion on the night in question, and four other people. After these interviews, Antonacci prepared a stop order and then an arrest warrant for defendant. When the State repeatedly asked Antonacci to explain the connection between his investigation and his search for defendant, defense counsel objected and the court sustained the objections. Antonacci also commented that, just after the shooting, Velazquez told him that the three men had exited a yellow station wagon while he was outside the tavern and that his assailant had hazel eyes and a light complexion.

The stipulated testimony of the forensic pathologist, Dr. Joanne Richmond, was that Moyet died from a gunshot wound to the neck, at the area of the carotid artery. He was shot from the front, with no evidence of close-range firing.

After the State rested and the circuit court denied defendant's motion for a directed verdict, defendant himself testified. On the night of the shooting, he and a friend, Marco Alverez, had gone to the tavern to purchase liquor; he had never been there before. Only 17 at the time, he nevertheless had been drinking beer with Marco and others earlier in the evening. Marco entered the building alone, and defendant noticed two men, one of whom was Velazquez, standing outside in front; the two men "started talking and pointing behind [Marco's] back" and followed him inside. Defendant became suspicious and went inside to warn Marco about the two men. When defendant entered, Moyet was only four or five feet away, talking to the person behind the bar. Moyet turned and began cursing defendant. Defendant and Moyet argued for a few seconds, and then someone tapped

defendant on the shoulder. Defendant turned, was struck by an unknown person, and fell. He then rose, dazed and scared, and ran out the door. As he was running, he heard two or three shots. He denied shooting, or even having, a gun; he saw no weapon in Moyet's hands. The day after the shooting, he went to Mexico, where he lived with his family for four years. Defendant stated that he is five feet seven inches, has greenish-brown eyes, and always wears glasses. At the lineup, he said, the police removed his glasses.

After the jury returned guilty verdicts on murder, attempted murder, and aggravated battery, the court found that the aggravated battery conviction merged with the attempted murder conviction and sentenced defendant to 28 years for the murder and to a concurrent 18 years for the attempted murder.

I

Defendant's first challenge to his convictions is that his sixth amendment right to confront witnesses was violated because the State improperly incorporated references to statements by nontestifying eyewitnesses to bolster Velazquez's identification of defendant. This error, he claims, warrants reversal. Defendant faults especially the prosecutor's questions to Antonacci about his investigation. These questions elicited testimony that after Antonacci read other officers' reports from the night of the shooting, he interviewed a number of people, including Marco Alverez and Velazquez, and that within two days of these interviews, he began looking for defendant.[1] Within a week of the shooting, Antonacci issued the stop order for defendant. A month later, he obtained an arrest warrant. In particular, defendant objects to the following line of questioning:

"Q: Now, the arrest warrant that you had issued, was that based upon information that you had gathered from your interviews—

[Defense attorney]: Objection.

Q: —with various persons and records you had read?

[Defense attorney]: Objection.

THE COURT: Sustained.

A: Yes

---

[1]Antonacci also said that he spoke with someone at defendant's address who said his name was Raul Silva. In a sidebar, defense counsel objected to admission of Raul's statement that he was defendant's brother, denying that it was so. The court sustained the objection, but Antonacci mentioned it in response to the State's question whether Raul responded to a request for his name.

[Defense attorney]: Objection.

THE COURT: Sustained.

A: I am sorry, your Honor.

THE COURT: Sustained.

Q: [Assistant State's Attorney]: What was that arrest warrant based upon?

[Defense attorney]: Objection

THE COURT: Sustained.

Q: [Assistant State's Attorney]: Okay.

\*\*\*

Q: Why were you in [defendant's] neighborhood looking for him?

[Defense attorney]: Objection as to why.

THE COURT: Sustained.

Q: [Assistant State's Attorney]: Well, sergeant, did you have any information, personal information, that caused you to be in the neighborhood looking for him?

A: Yes, sir.

[Defense attorney]: Objection.

THE COURT: Sustained."

The State, claims defendant, impermissibly accentuated this point in its closing argument by connecting its explanation of circumstantial evidence with the following comments about Antonacci's testimony:

"Sergeant Antonacci testified and \*\*\* told you what he did in conducting his investigation. That is important for you to know what he did. We're not trying to hide anything from you. We're trying to let you know that there were persons who were there at that bar. There was testimony, ladies and gentlemen, and you heard it from Officer Guin that there were ten people in that bar.

Sergeant Antonacci \*\*\* was following up on his responsibility and duty. He went out to interview those people and that is what he testified to. He put it together for you. We didn't want to leave any gaps for you. He talked to those persons. He said, ['] yes, I talked to Mr. Alverez. I talked to these various other people.[']

Detectives Harrington and Peterson also had the name of this defendant \*\*\*."

In combination, defendant asserts, the improper questioning and argument is capable of only one inference and thus had the natural effect of informing the jury that the nontestifying detectives and interview subjects identified defendant as the offender. Worse yet, maintains

defendant, the close connection between the State's mention of circumstantial evidence and Antonacci's testimony told the jury that it should take such statements into account as circumstantial evidence. As such, the State's conduct constitutes constitutional error, he claims, even if the hearsay was merely insinuated rather than actually spoken at trial. The State's behavior here is particularly egregious, defendant insists, because Velazquez's identification was "vague [and] generic," and admission of hearsay identification testimony is reversible error when used to bolster a weak identification.

The State's initial response is that defendant waived this issue by not objecting to the argument and not including it in his post-trial motion. Should this court choose to address the merits, however, the State continues, the challenged testimony was not hearsay because, as the prosecutor explained in a sidebar at trial, the testimony was being offered not for its truth but to inform the jury of Antonacci's conduct during the investigation and his response to information. Moreover, only the fact of the interviews and Antonacci's resultant action were elicited, not the content of the interviews. Ultimately, argues the State, the natural effect of the testimony at issue was to recount Antonacci's investigatory steps rather than to tell the jury about out-of-court identifications. Even if a jury might have concluded from the challenged remarks that the nontestifying declarants were eyewitnesses who named defendant as the perpetrator, the State notes, only one of those interviewed (Marco Alverez) was later identified as an occurrence witness, so this is just one of a number of possible explanations for Antonacci's conduct.

Defendant replies that the issue is reviewable even though not perfectly preserved because he objected at trial to this line of questioning or, alternatively, that this court may review it as plain error. Defendant contends that other possible interpretations of the questions are beside the point because of the number of improper questions and the prosecutor's suggested interpretation during closing argument.

We agree with defendant that the right to confront accusing witnesses is so fundamental that its alleged violation would fall within the embrace of the plain error doctrine, making it reviewable under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). As the State suggests, however, no violation occurred here because the testimony the State sought to elicit is not hearsay.

> "When a police officer testifies as to the fact that he had a conversation with an individual and that he subsequently acted thereon, without revealing the substance of the conversation,

that testimony does not amount to hearsay. [Citations.] This type of testimony is based on the officer's personal knowledge and is competent to show his investigatory procedure. [Citation.] Where such testimony is confined strictly to the officer's physical activities, the bare occurrence of the conversation and the testimony is subject to cross-examination, this evidence is not within the legal definition of hearsay." (*People v. Wilson* (1988), 168 Ill. App. 3d 847, 850, 523 N.E.2d 43, 45, *appeal denied* (1988), 122 Ill. 2d 592, 530 N.E.2d 262.)

As the Illinois Supreme Court stated in *People v. Henderson* (1990), 142 Ill. 2d 258, 304, 568 N.E.2d 1234, 1256, *cert. denied* (1991), ___ U.S. ___, 116 L. Ed. 2d 189, 112 S. Ct. 233:

"[T]estimony recounting the steps taken in a police investigation is admissible and does not violate the sixth amendment, even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements and so inform the jury that they told the police that the defendant was responsible for the crime."

*Henderson* teaches that mere insinuation that out-of-court declarants have identified a defendant as a perpetrator does not trigger sixth amendment protection—the content itself of such declarations must be revealed, directly or indirectly, before the right to confront witnesses is implicated. Here, as in *Henderson*, there was nothing for defendant to cross-examine because defense counsel's timely objections, which the circuit court sustained, prevented the jury from hearing the content of the conversations. Thus, ironically, defense counsel's vigorous representation prevented the occurrence of a constitutional violation.[2] Too, even if one natural effect of the questioning and argument was to allow the jury to infer that those interviewed had named defendant as the shooter, this was not the sole possible inference; instead, because the content of the interviews was not revealed and because only one of the interview subjects later was named, by defendant, as an eyewitness, the jury could have concluded that the interviews had established a connection between defendant and the crimes in some

---

[2]We must stress that we hold only that the State's thwarted effort to bring out this testimony is not a ground for reversal in this case. We emphatically do not condone the prosecutor's behavior—indeed, we find reprehensible the State's repeated efforts to elicit evidence that the circuit court so plainly had ruled inadmissible by sustaining objection after objection.

other way. (*People v. Holman* (1984), 103 Ill. 2d 133, 148-49, 469 N.E.2d 119, 126-27, *cert. denied* (1985), 469 U.S. 1220, 84 L. Ed. 2d 347, 105 S. Ct. 2044.) Under these circumstances, we must reject defendant's claim that he was deprived of his right to confront witnesses against him. Even if we were persuaded otherwise, as demonstrated below, application of the plain error doctrine would not warrant reversal because the error would have made no difference in the outcome of the trial.

## II

During direct examination of Moyet's wife, the prosecutor asked her the ages of her children at the time of the trial. When the prosecutor asked their ages at the time of the shooting, the defense objected on relevance grounds, but the court overruled the objection. Mrs. Moyet then said the children had been 2½ and 3½ in January 1984. The State also elicited her testimony describing pictures of Moyet, including one taken with one of his children. The court later refused to admit the picture into evidence, however, commenting: "You can't just parade that in front of the jury." The prosecutor also made passing mention of Moyet's children during opening statement and closing argument; defendant objected to neither reference.

Defendant contends that the State improperly emphasized the plight of Moyet's survivors, a wife and two young children. He particularly objects to the above testimony because such information is irrelevant to the charge of murder, and when it is coupled with family pictures, the State's intent was plainly to "paint an excessively sympathetic picture of [Moyet]." Thus, defendant contends, in a case such as this, in which the verdict turned on the complaining witness' credibility as opposed to that of defendant, error in the admission of such irrelevant, inflammatory evidence warrants a new trial.

The State again responds that defendant waived this issue by not objecting at trial to each of the statements he now challenges. On the merits, the State argues that the remarks are too minimal to have affected defendant's trial result. Defendant responds, as above, that this court has the power to review this issue despite his not having preserved it.

■ Even if we determine that defendant did not waive this issue, a review on the merits would offer him little help. To be sure, evidence or comment about a victim's family has no bearing on guilt or innocence. To be deemed reversible error, however, such remarks must result in substantial prejudice to a defendant. (*People v. Sanders* (1988), 168 Ill. App. 3d 295, 300, 522 N.E.2d 715, 720, *appeal denied*

(1988), 122 Ill. 2d 589, 530 N.E.2d 259.) In this context, the question is whether the family information was made to appear material or was used to inflame the jury. *People v. Barrow* (1989), 133 Ill. 2d 226, 274-75, 549 N.E.2d 240, 260, *cert. denied* (1990), 497 U.S. 1011, 111 L. Ed. 2d 767, 110 S. Ct. 3257.

At trial, Moyet's survivors were mentioned four times: in the State's opening statement, the prosecutor noted that Moyet "had two little children, ages three and four"; the prosecutor inquired about the length of the Moyets' marriage and asked the ages of the children in 1984 and in 1988; a picture with Moyet, his wife, and one of his children was described; and at closing, the prosecutor mentioned that Moyet and Velazquez "had families. They had children." These remarks are not "melodramatic" or "significantly inflammatory," nor did the State dwell in its closing argument on the images of a young widow with two innocent, fatherless children. Moreover, the circuit court, as noted above, refused to admit into evidence the picture of Moyet with one of his children upon defense counsel's objection to it as too sympathetic. Because the references to Moyet's family were "sufficiently brief and curtailed so as not to constitute a passionate appeal to the jurors' sympathies," we cannot agree with defendant that the comments so prejudiced him that he did not receive a fair trial. *People v. Bass* (1991), 220 Ill. App. 3d 230, 252, 580 N.E.2d 1274, 1289; *People v. Easley* (1992), 148 Ill. 2d 281, 333-35; compare *People v. Spika* (1992), 229 Ill. App. 3d 189, 198 (information about victim was innocuous, making error, if any, harmless), with *People v. Logan* (1991), 224 Ill. App. 3d 735, 739-43, 586 N.E.2d 679, 682-85 (testimony and argument about victim's family, if made to appear material to culpability, constitute reversible error).

### III

Defendant next contends that he was denied a fair trial because the State made the "prejudicially improper and unfounded" insinuation, by its questions as well as in its opening statement and closing argument, that defendant was a gang member and that the crimes were gang-related. He argues that prejudice against street gangs is so strong that evidence of gang membership or activity may not be introduced absent a demonstrable connection between a defendant's gang membership and the crime at issue. Although the prosecutor observed in opening remarks that just before firing, defendant "shouted out a gang slogan, Ambrose love," defendant claims that the State never presented competent evidence that "Ambrose" was a gang slogan, that defendant was a gang member, that the shooting was gang-

related, or that the shooter shouted "Ambrose love" as opposed to just "Ambrose." Instead, defendant argues, Velazquez made only a passing reference to the word during his direct testimony when he said that defendant had "called a gang name, Ambrose, you know," and merely replied "yeah, yeah, correct" when the prosecutor prompted him on redirect examination, as part of a leading question incorporating other facts, to agree that defendant had shouted "Ambrose love" just before he began shooting. Defendant also criticizes the State's references to gangs in the State's closing argument:

> "Here is this defendant. He goes in there. He had been drinking. He has got a gun. He is boisterous, bumps into somebody, Ambrose Love. I mean is it something unusual? It is something that we in our own experience know about day in and day out. We know about gang activities. We know about gang slogans."

Defense counsel objected and the court sustained the objection. A few moments later, however, the prosecutor revisited this theme:

> "[Velazquez] is a person who is relatively street wise. He lives on Chicago Avenue here in Chicago. He knows what is going on in the street. When he saw this defendant after hearing him say Ambrose Love, what do you think went into his mind[?] I will let you decide what went into his mind. Who does he think this person was?"

To rid the convictions of the alleged taint brought about by unsubstantiated gang references, defendant urges us to reverse his convictions and to remand for a new trial.

The State counters that defendant once again waived the issue by not objecting to Velazquez's testimony during trial and, in any event, evidence of gang-related activity may be admitted if otherwise relevant and admissible, especially to provide a motive for behavior as otherwise inexplicable as the crimes here. The State asserts that Velazquez's testimony establishes that defendant himself cried out "Ambrose love," and that further testimony at trial established that "Ambrose" is the name of a street gang. As for the prosecutor's remarks at closing, the State insists that they were based on the relevant and admissible evidence that defendant yelled a gang slogan before drawing his gun.

In reply, defendant distinguishes *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671, in which "King love" was yelled out before a street fight, because (1) the State presented no proof here that defendant was a gang member; (2) the only evidence that "Ambrose" is a gang name came from Velazquez; and (3) the State, not defendant, raised the specter of a gang connection here. Defend-

ant draws analogies to *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900, in which the Illinois Supreme Court reversed a conviction because the State had raised the issue of gang activity, not to illuminate the jury as to contested facts, but rather to arouse the jury's prejudices.

■ The rule on admission of evidence of gang membership is well settled:

> "[E]vidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. [Citations.] Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.

See also *People v. Gonzalez* (1991), 142 Ill. 2d 481, 489, 568 N.E.2d 864, 867 ("[G]ang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible"); *People v. Williams* (1992), 228 Ill. App. 3d 981, 989-90 (gang-related evidence admissible to demonstrate motive); *People v. Mendez* (1991), 221 Ill. App. 3d 868, 875, 582 N.E.2d 1265, 1270-71, *appeal denied* (1992), 143 Ill. 2d 644, 587 N.E.2d 1021.

In *Smith*, the court found that no evidence supported the State's theory that the crime was gang-related, so the only purpose in admitting evidence of a gang connection was an impermissible one—to inflame the jury's passion or arouse its prejudice against the defendant. Here, unlike *Smith*, there was evidence that the crimes were gang-related because Velazquez testified that "Ambrose" was indeed the name of a gang and that defendant had shouted "Ambrose love" just before shooting Moyet. Defendant did not object to Velazquez's testimony that defendant said the word "Ambrose" or the phrase "Ambrose love," nor did defendant contest Velazquez's characterization of the word, either by questioning Velazquez on cross-examination or by offering evidence that the word had another meaning. Accordingly, we cannot say that the evidence was incompetent or inadequate. Defendant also did not deny during his own testimony that he had said the word or the phrase, evidence that the jury could have weighed against Velazquez's testimony. In addition, defendant neglected to ask for a cautionary instruction limiting the jury's consideration of this piece of evidence.

In sum, we cannot say that the implication, that one who shouts a gang name is a gang member who is acting out of gang-related concerns, was unfounded. Although we agree with defendant that evi-

dence of gang activity may be introduced only if it is somehow connected to the crime at issue (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, 854, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658), defendant himself made the requisite connection by speaking the words during the incident. As a result, because the uncontradicted evidence was that defendant, prior to the shooting, spoke a phrase that was identified as a gang slogan, the prosecutor committed no error in highlighting it in both opening and closing remarks. Even if it were error, such error would not be reversible in light of the evidence against defendant. *People v. Easley*, 148 Ill. 2d at 329-30.

## IV

Defendant argues that because this case was, in his opinion, a swearing contest between himself and Velazquez, the cumulative impact of the errors alleged above, even if not reversible individually, denied him a fair trial when combined with the State's characterization of the defense during closing argument as one "of desperation and distortion" that was only "a shiny silver dollar" compared to the State's more valuable "crumpled $500 bill." He also objects to the State's criticism of the defense's closing argument as a mandate to the jury to "think like children," "forget about the evidence and the law," and accept an invitation to concentrate only on "naked speculation." Defendant notes that courts have repeatedly condemned such attempts by the State to characterize a defense as a fraud or an attempt to "confuse, fool, mislead, or otherwise trick the jury." Because the testimony of the sole testifying occurrence witness out of 10 people in the bar, Velazquez, was so "weak, contradictory, and inconsistent with much of the physical evidence," he claims, the totality of the errors affected the verdict, warranting a new trial.

The State argues first that defendant waived his opportunity to appeal this point by not challenging the remarks at trial or in his post-trial motion. It also disagrees that this was a close case, characterizing the evidence against defendant as overwhelming. It observes that errors are reversible only if the verdict would have been different in their absence. Noting that closing arguments may address facts directly proved or fairly and reasonably inferred therefrom, the State asserts that it stayed within the bounds. It distinguishes the cases defendant cites, characterizing them as extreme examples of prosecutorial misbehavior against which the comments here "pale in comparison." The State also emphasizes that the prosecutor referred only to defendant, not his counsel.

■■ As the Illinois Supreme Court observed in *People v. Emerson* (1983), 97 Ill. 2d 487, 502, 455 N.E.2d 41, 47, quoting *Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 517, "[w]here guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene. 'Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial.' " Here, however, the jury heard an impressive quantum of evidence of defendant's guilt: after over four years, Velazquez was able to pick defendant out of a lineup with no apparent difficulty; he gave a moment-by-moment account of the incident itself as well as of the events that led up to it; and his description of his assailant at the time of the incident was consistent with defendant's appearance in 1984. Moreover, defendant's own version of the incident substantially corroborated the version given by Velazquez; the only significant difference was defendant's role as the shooter, a fact not likely to be misrepresented by Velazquez. Accordingly, we hold that, on this record, there is no ground for reversal because even eliminating the accumulation of the errors alleged, including the prosecutor's disparaging remarks during closing argument, would not have led the jury to a different result. *People v. Williams* (1992), 228 Ill. App. 3d 981, 1013-14.

## V

In the State's closing argument, the prosecutor described attempted murder as "when [a person] with intent to commit the offense of attempt [*sic*], does any act which could be a substantial step towards the commission of the offense of murder." Shortly thereafter, the court gave the jury the following instructions:

> "A person commits the offense of attempt when he with the intent to commit the offense of murder does any act which constitutes a substantial step towards the commission of the offense of murder.
>
> The offense attempted need not be committed.
>
> To sustain the charge of attempt, the State must prove the following propositions.
>
> First, that the defendant performed an act which constituted a substantial step for the commission of the offense of murder; and
>
> Second, that the defendant did so with the intent to commit the offense of murder.
> \* \* \*

A person commits the offense of murder when he kills an individual if in performing the acts which caused the death, he intended to kill or do great bodily harm to that individual; or he knows that such acts will cause death to that individual, or he knew that his acts created a strong probability of death or great bodily arm [*sic*] to that individual."

Defendant contends that these jury instructions did not make sufficiently clear that a specific intent to kill "is the pivotal element of the offense" and that an intent to cause mere great bodily harm is not enough to form a basis for conviction. He asserts that an almost identical instruction was held to be reversible error in *People v. Nuno* (1990), 206 Ill. App. 3d 160, 563 N.E.2d 1165, and *People v. Kraft* (1985), 133 Ill. App. 3d 294, 298, 478 N.E.2d 1154. Even though defendant did not object to the instructions at trial, he argues, the waiver rule is inapplicable because specific intent is an essential element of the crime at issue and thus cannot be waived.

The State first argues that the waiver rule applies because defendant made no contemporaneous objection to the instructions. The State adds that any error was harmless because the circumstances here make defendant's intent to kill Velazquez unquestionable. Finally, the State argues, because vacatur of the conviction for attempted murder would have no effect on defendant's overall prison term, this court need not consider the issue.

█ Because the alleged error in the instruction addresses an essential element of the offense, which could have affected defendant's substantial rights, we review it even though defendant proffered no objection at trial. 134 Ill. 2d R. 615(a).

In *People v. Gentry* (1987), 157 Ill. App. 3d 899, 510 N.E.2d 963, the court warned that

"a trial court instructing a jury on the crime of attempted murder must make it clear that specific intent to kill is the pivotal element of the offense, and that intent to do bodily harm, or knowledge that the consequences of defendant's act may result in death or great bodily harm, is not enough." (157 Ill. App. 3d at 903, 510 N.E.2d at 966.)

Under *Gentry*, courts must communicate to a jury the unambiguous message that an intent to cause any result other than death will not suffice for conviction for attempted murder. Here, the court instructed the jury that to convict defendant of attempted murder, it had to find that defendant had acted with an intent to commit murder; it then defined murder as, among other things, killing another with the intent to inflict (or knowledge of the likelihood of) great

bodily harm. From this combination of instructions, the circuit court did not make it sufficiently plain to the jury that specific intent to kill was a prerequisite to a verdict of guilty on this charge. Thus, giving this instruction was error.

The error, however, was harmless. Unlike *Nuno*, there is no indication that the jury here was confused by the interface between the instructions. In addition, by firing a gun at Velazquez from a distance of only 10 feet, defendant conveyed an unmistakable intent to kill him. (*People v. Wilson* (1991), 224 Ill. App. 3d 364, 367, 586 N.E.2d 547, 549; *People v. Mendez* (1991), 221 Ill. App. 3d 868, 876-77, 582 N.E.2d 1265, 1271.) Moreover, defendant never disputed that the requisite intent existed, contending only that he was not the perpetrator. Thus, because a proper instruction on attempted murder would have made no difference in the outcome of defendant's trial, we find no resultant prejudice. *People v. Solis* (1991), 216 Ill. App. 3d 11, 20, 576 N.E.2d 120, 125, quoting *People v. Bryant* (1984), 123 Ill. App. 3d 266, 274, 462 N.E.2d 780, 786 (if intent to kill is evident from the circumstances, erroneous intent instruction does not warrant reversal).

For all the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.