THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE GAYFIELD, Defendant-Appellant.

First District (1st Division)    No. 1—90—0686

Opinion filed April 18, 1994.

380

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Carol A. Mengel, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Defendant Willie Gayfield was charged by indictment No. 88—CR—16825 with first degree murder and armed violence. (720 ILCS 5/9—1, 33—2 (West 1992).) Following a jury trial defendant was convicted of first degree murder and sentenced to 33 years in prison. Defendant appeals from his conviction and sentence.

Defendant raises one issue on the pleadings, contending that the trial court erred in denying his motion to dismiss the indictment on the grounds of judicial estoppel. He further argues that: (1) the trial court erred in allowing a State witness to testify that he was threatened not to testify at trial against defendant; (2) he was denied a fair trial where, during cross-examination, the State made repeated reference to alleged threats made towards a State witness; (3) he was denied a fair trial where comments were made by the prosecutor which implied that "Main" (defendant) was the shooter; (4) the cumulative impact of improper comments by the State deprived defendant of a fair trial; (5) the trial court erred in admitting evidence that the shooting was gang related; and (6) the trial court erred when during the polling of a juror the court failed to fully inquire when that juror appeared to be ambivalent in his response to the court.

According to the record, on September 18, 1988, Officer Skorodynski was assigned to patrol the 11th district, which included the area of 2417 W. Adams, a Chicago Housing Authority project known as Rockwell Gardens. While on patrol, Skorodynski discovered a body, later identified as Eric Rodgers, lying in front of a building at 2417 W. Adams. He called for an ambulance, checked the body for vital signs, then called for a supervisor and detectives. Officer Skorodynski spoke with Katie Woods, a witness and resident of the housing project. After briefly speaking with Woods, Officer Skorodynski instructed Woods to talk with his supervisor, Sergeant Black, who had arrived at the scene.

Skorodynski testified that the building where the body of Rodgers was found was occupied and controlled by the Disciples street gang, while other buildings in the Rockwell Gardens project were occupied and controlled by the Vice Lords. He further testified that prior to September 18, 1988, there had been many gang-related shootings within the housing project.

Katie Woods testified that she and defendant lived in the same building and that she knew him by the names of Willie Gayfield and "Main." She stated that the day before the murder, she was at defendant's apartment, where she saw a silver gun with a brown handle on the couch beside defendant.

Woods stated that about 6 p.m. on the day of the incident, she was inside her apartment, heard three or four shots, and looked out of the window where she noticed a body lying on the ground. She then went outside to view the scene and recognized the dead man as Eric Rodgers. Woods testified that she returned to her apartment and defendant entered. She later went back outside, spoke with a police officer, and then she and the officer went back inside the apartment. Woods testified that defendant was inside the apartment with two men she called "Country" and "Little Rob." After ordering the three men to place their hands on the table, the officer took the men out of the apartment to the station. Woods testified that the next morning defendant returned to her apartment about 4 a.m.

Officer Mizera testified for the State that on the night of the incident, he assisted Officer Skorodynski in protecting the crime scene at Rockwell Gardens. While performing his duties, he overheard persons in the crowd discuss the shooting and heard someone mention the name "Main." He later spoke with Officer Natualla and several other persons near the crime scene before going to the fifth floor of the building to look for the assailant. Officer Mizera testified that he knocked on several doors and spoke with one woman, but he did not arrest anyone. Officer Mizera stated that while knocking on the doors he was looking for someone called "Main." Defendant objected to this statement, and the court sustained his objection.

Detective Kato also testified for the State. Kato stated that as a gang specialist, he had identified and monitored gang activity in the area of the Rockwell Housing project, and knew the gang faction to be split into two factions: Folks and People. He testified that the Disciples fell under the Folks and the Vice Lords fell under the People. He asserted that the Disciples and Vice Lords were rival gangs. He further testified that the building located at 2417 West Adams was a building controlled by the Disciples, while the other buildings in the Rockwell Gardens project were all controlled by the Vice Lords.

Detective Kato testified that he had known defendant and his family for six years and that defendant had admitted to being a Disciple. On September 18, 1988, Kato had a conversation with defendant at the Area 4 headquarters. Defendant was released that same day, but two days later Kato had a conversation with J.D. Mathis, a witness to the shooting, after which he arrested defendant.

J.D. Mathis testified that he was a member of the Disciples street gang, the gang to which defendant also belonged. He stated that about 6 p.m. on September 18, 1988, he went to 2417 West Adams to visit his son. Before entering the building he saw Eric Rodgers. Mathis testified that he had known Rodgers for 10 years and knew Rodgers to be a member of the Vice Lords. Mathis testified that the building at 2417 West Adams was controlled by the Disciples, but that Rodgers was usually allowed to enter the building because his daughter lived there.

Mathis testified that he talked with Rodgers before entering the building. Mathis' back faced away from the building, while Rodgers' back faced toward the building as the two men spoke. Mathis testified that he saw defendant exit the building, and once defendant was within two feet of Rodgers, defendant shot Rodgers. Mathis testified that defendant had a .38-caliber gun in his hand, which he had seen defendant with prior to the shooting.

Mathis stated that after defendant shot the victim he reentered the building through the back entrance. Rodgers' body at that time lay on the ground. Mathis testified that he went into the building and called his father. Mathis did not call the police immediately, but did call them two days later.

Glen Rodgers testified that Eric Rodgers was his brother and that the two grew up in the 2417 West Adams building. He stated that Eric would visit with his daughter who lived in the building. Glen testified that he had known defendant and his family for about 18 years and knew defendant to be a member of the Disciples. He stated that he worried about Eric entering the 2417 building because Eric was a member of the Vice Lords and the building was controlled by the Disciples.

Detective Hanrahan testified that he had been an Area 4 violent crimes detective for 12 years. He stated that on September 18, 1988, he was assigned to investigate the shooting of Eric Rodgers. Hanrahan stated that when he arrived at 2417 West Adams, Eric Rodgers' body was lying on the ground. Hanrahan stated that one of the tests he could have requested to be performed by the evidence technician was a gunshot residue test. He stated that he did not request that a test be performed on defendant because he has found the test to be unreliable.

Latero Jones testified on behalf of defendant. Jones was 15 years old at the time of trial, had pleaded guilty to the murder of Eric Rodgers, and was incarcerated in the juvenile department of corrections. He testified that he had previously lied to the court when he pled guilty to the murder of Rodgers. Jones had earlier testified during his plea hearing that he assisted Richard Cooks in murdering Eric Rodgers by pointing Rodgers out to Cooks. He stated that his testimony to the court that he assisted Richard Cooks, his cousin, in murdering Rodgers was not true.

Jones also testified that he lied to the police when he was taken into custody because he was afraid that he might be killed when he was released. Jones stated at trial that he considered defendant a good friend, and because defendant had more seniority in the gang and was the older of the two, he believed it was his responsibility to take the blame in order to protect defendant.

Jones stated that about one hour prior to the murder of the victim, he was present with defendant and other gang members when a discussion occurred about the pending murder and who would take the blame for it. Jones testified that, at that time, it was decided that Richard Cooks would "take the fall" for the murder because he was the youngest member of the gang and would serve the least amount of time.

During trial, it was stipulated that if Cynthia Jones were called to testify, she would state that prior to the shooting, she saw Eric Rodgers talking to J.D. Mathis outside the front entrance of the building where Rodgers was murdered. The parties also stipulated that Cynthia would testify that she heard the gunshots, looked outside the building and saw a body lying on the ground. About five minutes after she heard the gunshots, she saw defendant in the building.

Defendant first argues that the court erred in denying his motion to dismiss the indictment. He asserts that the doctrine of judicial estoppel precluded the State from prosecuting him as the shooter of Rodgers where Latero Jones was prosecuted for the same murder, and where the State's theory was that a person other than defendant was the shooter. (*Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 9, 433 N.E.2d 1112.) Defendant contends that the State, as a party to a lawsuit, cannot maintain a certain position in one proceeding and then become a party to another suit and maintain a contrary stance. (*Giannini v. First National Bank* (1985), 136 Ill. App. 3d 971, 983, 483 N.E.2d 924.) Defendant asserts that in the instant case, the State took the position that Richard Cooks was the person, assisted by Jones, who shot Eric Rodgers. Defendant contends that the State

stipulated to the fact that Richard Cooks was the shooter, but subsequently brought charges against defendant. Defendant argues that in the instant case, the State maintained Richard Cooks had nothing to do with the shooting of Rodgers, but in a separate criminal proceeding stipulated that Cooks was the shooter, an inconsistent position.

The State maintains that it did not take a contrary position in defendant's trial by accepting the plea of Latero Jones. The State maintains that defendant failed to cite authority to support his contention that it was required to believe and accept every statement of Jones in order to accept his guilty plea.

■ The doctrine of judicial estoppel provides that when a party assumes a certain position in a legal proceeding, that party is estopped from assuming a contrary position in a subsequent legal proceeding. *People v. Wisbrock* (1991), 223 Ill. App. 3d 173, 175, 584 N.E.2d 513.

In the instant case, on the day after the shooting, Latero Jones told the police that his cousin Richard Cooks shot Eric Rodgers and that he assisted Cooks in the murder by pointing Rodgers out to Cooks. Jones subsequently gave a statement to the assistant State's Attorney in which he stated that Cooks wanted to kill Rodgers because Rodgers had "beat [Cooks] out of drug money." Jones also told the assistant State's Attorney that Cooks fired the shot that killed Rodgers. Jones further testified that while in the Audy Home he was approached by Abe Morris and told that he "had better plead guilty or he would be killed when he got out."

Jones pled guilty to the murder of Rodgers, and at the dispositional hearing on November 14, 1988, the facts surrounding the shooting were placed of record. At that time, it was stipulated between the State and Jones that Richard Cooks killed Rodgers, and that Jones was pleading guilty because he had helped his cousin commit the murder. At trial in the instant case, Jones testified on cross-examination that he would rather do his 30 months in the juvenile facility than tell anyone that defendant committed the murder. Thus, it would appear from the facts that the State's theory was that Cooks was the perpetrator. However, we find that the State's theory, by accepting Jones' guilty plea, was that Jones was accountable for the murder of Rodgers, as distinguished from the veracity of whether Cooks was the shooter. This is particularly true where Cooks was never prosecuted for the crime.

The fact that Jones named Cooks as the individual he assisted in the murder of Rodgers does not negate the State's theory that Jones was accountable for the murder. The only relevancy of naming Cooks

is that it supported Jones' confession that he acted in concert with another in accomplishing the murder. To be certain, Jones could have named anyone as the shooter.

■ Although the State later brought an indictment against defendant charging him as the shooter, that action was not inconsistent with the dispositional hearing, stipulation, and the State's theory at the time of the dispositional hearing. By stipulating and accepting Jones' guilty plea, the State intended that the trier of fact accept the truth of Jone's statement that he assisted in the murder.

Moreover, we find unpersuasive the authorities which defendant cites for his contention that the State in the instant case was judicially estopped from prosecuting defendant. In *Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 433 N.E.2d 1112, Finley testified under oath in a divorce proceeding in Indiana that 40% of certain stocks were owned by his children and not marital property. He later brought a declaratory judgment action in Illinois to have a declaration that the children were not the owners of the stock and that he was. The appellate court in that case held that Finley could not contend that the stock was his property having convinced the Indiana courts that it belonged to the children and was not marital property.

In *Giannini v. First National Bank* (1988), 136 Ill. App. 3d 971, 483 N.E.2d 924, a mortgage holder took the position in a foreclosure action that it would honor and follow the plans of the land developer of a condominium. Subsequently, the mortgage holder sought to avoid its agreement because of financial hardship. Giannini brought suit for specific performance of that agreement, and the court stated that the rule of judicial estoppel precluded the mortgage holder from maintaining a contrary position in the specific performance suit from that position represented in the mortgage foreclosure action. *Giannini*, 136 Ill. App. 3d at 983.

These cases are distinguishable from the instant case, where the State never named Cooks as a party in either the dispositional hearing or at trial. The State never took the position in either proceeding that Cooks was the shooter. Therefore, there was no certain position taken at one proceeding that was contrary to another proceeding. Thus, the doctrine of judicial estoppel is not applicable, and the trial court did not err in denying defendant's motion to dismiss the indictment.

Defendant contends in his next two arguments that he was denied a fair trial where the court allowed into evidence testimony by Latero Jones that he was threatened into admitting that he committed the murder, and by the prosecutor's repeated reference to hearsay evidence of such a threat. Defendant maintains that there was

insufficient evidence attributing the alleged threats to him, and that the prosecutor persisted in eliciting hearsay evidence after being admonished by the court to refrain from such testimony.

The State maintains that the testimony, as it related to the threats, was offered to show their effect on Jones before he pled guilty to the murder of Rodgers and to rebut an inference of fabrication. The State contends that because the out-of-court testimony was used for a purpose other than to prove the truth of the matter asserted in the statement, there was no requirement that the threats had to be tied to defendant. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) The State further contends that it had a right of cross-examination to show any bias that Jones may have possessed or his interest to testify falsely. *People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9.

In the instant case, defendant assigns error to a question by the prosecutor during cross-examination to which Jones responded: "[There] was a discussion as to who would take the fall for the murder of Eric Rodgers." The prosecutor asked who was present, and Jones replied, "Richard Cooks, Latero Jones and Rob Walker, and I think Main." When asked by the prosecutor what was said by the individuals present, Jones answered, "Since Richard Cook was the youngest, he would have got less time." Defendant maintains that Jones did not attribute any threatening statement made by defendant, nor did Jones specifically identify defendant as being present in the meeting when a discussion was had as to who would take the fall.

Defendant also assigns error to the statement by Latero Jones that "A friend named Abe Morris came [to the Audy Home] and told me that I better plead guilty or when I get out my life might [be taken]." Defendant argues that there was no evidence in that statement which tied the alleged threat to him. Defendant contends that there was no evidence presented that Abe Morris was his agent or that he and Abe Morris were allegedly members of the same gang. Defendant thus asserts that the alleged threats were totally unsupported by any evidence from which the inference could be drawn that they were made by him. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 340, 433 N.E.2d 629.) Therefore, defendant maintains that the statements were prejudicial.

Evidence, whether oral or written, of an out-of-court statement that is offered to establish the truth of the matter asserted is hearsay because its value as evidence depends on the credibility of an out-of-court asserter for whom there is no opportunity for cross-examination. (*People v. Keen* (1990), 206 Ill. App. 3d 940, 950, 564 N.E.2d 1314.) Where, however, the evidence is offered for a purpose which is other

than establishing the truth of the matter asserted, the statement is not hearsay. *Keen*, 206 Ill. App. 3d at 950.

■ Here, the State contends that it questioned Jones about the threats to show both the effect the threats had on him and to rebut defendant's inference that Jones' testimony was recently fabricated. Although evidence of defendant's attempt to intimidate a witness is admissible to show consciousness of guilt (see, *e.g., People v. Goodman* (1977), 55 Ill. App. 3d 294, 296, 371 N.E.2d 168), the testimony at issue here was not admissible for that purpose, nor did it fall into one of the exceptions to the hearsay rule. Statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case. (*People v. Green* (1992), 233 Ill. App. 3d 298, 302, 584 N.E.2d 291.) Here, Jones was available to testify; thus, the first prong of the test (unavailability) was not met. Moreover, there is a lack of supporting evidence presented by the State that the statement made regarding any threats was made by defendant. Although the State maintains that it was proper for the statement to be admitted to show the effect it had upon the listener, Jones specifically testified that the person who delivered the threat to him was Abe Morris. The admission of the statement was irrelevant as it related to defendant. However, reversal is not warranted where there was other relevant evidence admitted sufficient to convict defendant. To be deemed reversible error, such remarks must result in substantial prejudice to a defendant. (*People v. Sanders* (1988), 168 Ill. App. 3d 295, 300, 522 N.E.2d 715.) We find that there was other relevant evidence offered by the testimony of J.D. Mathis that he saw defendant, within two feet of the victim, shoot the victim and reenter the 2417 building. We also find that there was the testimony of Kate Woods, which the trier of fact presumably found to be credible. She stated that she heard two or three shots and that, after hearing the shots, defendant entered her apartment. It has been held that a trial error will be deemed harmless where the evidence supporting the defendant's conviction is so overwhelming that the defendant's conviction would result even if the error were eliminated. (*People v. Jackson* (1990) 195 Ill. App. 3d 104, 114, 551 N.E.2d 1025.) We find that there was sufficient relevant evidence upon which the jury could have properly convicted defendant.

■ Defendant also maintains that it was error for the prosecutor to elicit questions related to the purpose for which Abe Morris was arrested, testimony that Jones was "a dead man" if he told the police

that defendant committed the murder, and that he lied to the police because he was afraid that he would be killed. The court sustained defendant's objections to the prosecutor's questions and instructed the jury to disregard the questions and answers. It is presumed that the jury followed the instructions of the court. *(People v. Gonzalez* (1991), 142 Ill. 2d 481, 491, 568 N.E.2d 864.) Hence, any error that was committed was harmless.

Defendant also argues that he was deprived of a fair trial by implied hearsay testimony offered by police officers that persons on the scene identified him as the shooter. Defendant contends that the testimony of Officer Mizera exceeded the bounds of permissible evidence of the investigatory steps taken by the officer and placed before the jury hearsay accusations. The State maintains that the testimony given by the officer was not offered to prove defendant's guilt, but to show the jury how the officer initially came to suspect defendant. The State contends that an officer may testify that he had conversations with victims or witnesses during the course of his investigation for the purpose of showing the investigatory procedure of the police. *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.

During the testimony of Officer Mizera, he testified that he talked with teenagers near the scene of the shooting and that he then spoke with his supervisor. The prosecutor asked Officer Mizera the following:

"[Prosecutor]: Did you ever go up into the 2417 Adams building?
[Witness]: Based upon the information I heard—
[Defense Counsel]: Objection.
[THE COURT]: Sustained.
Q. Did you go looking for anyone at that point?
A. Yes, I did.
Q. Who did you go looking for?
[Defense Counsel]: Objection.
[THE COURT]: Sustained."

Defendant contends that the above colloquy provided evidence of the prosecutor's attempt to elicit the name of defendant, who was known by the nickname "Main," and place it before the jury. Defendant asserts that the officer's later testimony that he went to the building at 2417 West Adams and asked the person who opened the door if she had seen a man named Main was an attempt to elicit defendant's name.

When a police officer testifies as to the fact that he had a conversation with an individual and that he subsequently acted thereon without revealing the substance of the conversation, that

testimony does not amount to hearsay. (*People v. Henderson* (1990), 142 Ill. 2d 258, 304, 568 N.E.2d 1234.) Testimony recounting the steps taken in a police investigation is admissible and does not violate the sixth amendment, even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratitutiously reveal the substance of their statements and so inform the jury that they told the police that the defendant was responsible for the crime. (*People v. Silva* (1992), 231 Ill. App. 3d 127, 135, 595 N.E.2d 1285.) Mere insinuation that out-of-court declarants have identified a defendant as a perpetrator does not trigger sixth amendment protection—the content itself of such declarations must be revealed, directly or indirectly, before the right to confront the witness is implicated. *Silva*, 231 Ill. App. 3d at 135.

■ Here, Officer Mizera testified that he knocked on the door of an apartment in the 2417 building and asked the person who answered the door whether she had seen Main. Thus, an inference could be drawn that as a result of his investigation the officer learned the name of defendant. However, the content of his interviews with the teenagers near the scene of the crime and his conversations subsequent to entering the building were not revealed during questioning. Even if one natural effect of the questioning and argument was to allow the jury to infer that those persons interviewed had named defendant as the shooter, this was not the sole inference that could be drawn. (See, *e.g., People v. Silva* (1992), 231 Ill. App. 3d 127, 135.) Moreover, defense counsel made timely objections to these inquiries, which the trial court sustained.

The record here does not reveal the content of Mizera's conversation with any witnesses had during the investigation. Further, the trial court sustained defendant's timely objections as to questions regarding these conversations. Therefore, defendant was not denied a fair trial. We thus find that defendant's argument that the cumulative impact of the errors made by the State denied him a fair trial is without merit.

Defendant further contends that the trial court erred in admitting into evidence that the shooting was gang related. Specifically, defendant contends that there was evidence establishing that decedent was shot because he had misappropriated drug funds.

The rule on admission of gang membership is well settled:

> "[E]vidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. [Citations.] Such evidence, however, is only

admissible where there is sufficient proof that such membership or activity is related to the crime charged." (*People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900.) Gang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible. *People v. Williams* (1992), 228 Ill. App. 3d 981, 989, 593 N.E.2d 968.

In the instant case, there was evidence that the victim and defendant were members of rival gangs. However, there is contradictory evidence that the shooting was gang related. Here, Latero Jones testified in his dispositional hearing that Richard Cooks shot Rodgers because Rodgers "fucked us over some drug money." However, he later recanted his story at trial. J.D. Mathis testified that he had known decedent for 10 years and that decedent was a member of the Vice Lords street gang. Detective Kato also testified that he knew defendant and his family and that defendant had admitted being a member of the Disciples. Further, there was testimony by Officer Skorodynski that the building where decedent was shot was controlled by the Disciples. Thus, there was sufficient evidence proffered of gang membership.

■ Defendant maintains that the gang-related evidence did not establish a motive for the shooting and was therefore erroneously admitted. The State maintains that the gang membership was relevant to show a motive for the shooting, where there was no outward animosity between decedent and defendant. The evidence in the record is conflicting as to the motive for the killing. Clearly, there is evidence of gang membership, but there is also evidence that the shooting was over the proceeds from drugs. The trial court bears the responsibility of determining the admissibility of evidence, with regard to relevancy, and its decision will not be reversed on appeal absent an abuse of discretion. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 487, 568 N.E.2d 864.) The erroneous admission at trial of the gang evidence does not automatically warrant reversal. (*People v. Easley* (1992), 148 Ill. 2d 281, 592 N.E.2d 1032.) Regardless of whether the case has been submitted to the jury with or without the gang evidence, the jury would still have been presented with the testimony of the eyewitness to the murder as well as the physical evidence in support of the State's case against defendant.

Here, it cannot be said that the trial court abused its discretion, although there was an alternative motive for the shooting other than gang-related activity.

Defendant finally argues that the trial court erred in not fully examining a juror whose response to the jury poll was ambiguous. During the polling of the jury the court questioned juror Glover and the following colloquy occurred:

"[THE COURT]: Mr. Glover, was this and is it now your verdict?
[Juror Glover]: No.
THE COURT: Pardon me?
Juror Glover: It wasn't, but it is now.
THE COURT: The question is, was this and is it now your Verdict?
Juror Glover: Yes."

The polling of a jury is intended to ascertain whether any juror had been coerced into agreeing upon a verdict. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 490, 508 N.E.2d 708.) In polling a jury, the trial court must be careful not to hinder a juror's expression of dissent. (*People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220.) However, the trial judge must also be careful not to make the polling process another arena for deliberations. If a juror indicates some hesitancy or ambivalence in his answer, then the trial court must ascertain the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to his present state of mind. *People v. Gunn* (1992), 237 Ill. App. 3d 508, 604 N.E.2d 1044.

■ Here, the trial court took a poll of the jurors. After juror Glover stated that he originally dissented from the verdict, the court gave him an opportunity to state his present intent. The juror then responded in the affirmative. It is therefore clear that the court complied with the procedure established to insure that the juror had not been coerced into agreeing on the verdict. Therefore, defendant's contention is without merit.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.